

# NUMBER 13-18-00483-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**WHITNEY GONSOULIN, M.D.,**                                    **Appellant,**

**v.**

**MARIA ZAMARRIPA, AS ADMINISTRATOR
OF THE ESTATE OF R.F.R. AND R.J.R., MINORS,**       **Appellee.**

### On appeal from the 445th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION
### Before Justices Benavides, Longoria, and Hinojosa
### Memorandum Opinion by Justice Benavides

By one issue, appellant Whitney Gonsoulin, M.D., appeals the trial court's denial

of his objections to an expert report filed by appellee Maria Zamarripa, as Administrator

of the Estate of R.F.R. and R.J.R., Minors, in support of her medical malpractice suit and

his motion to dismiss that suit. We affirm.[1]

## I.    BACKGROUND

The underlying facts of this case have been before this Court multiple times. Previously, in *Zamarripa v. Bay Area Health Care Group, Ltd.*, No. 13-15-00024-CV, 2016 WL 6962009 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied), Zamarripa appealed the trial court's granting of a motion to dismiss the expert report written by Frederick Harlass, M.D. This Court affirmed the trial court's dismissal. *Id.* at *5. In a related appeal, *Columbia Valley Healthcare System, L.P. v. Zamarripa*, 520 S.W.3d 62 (Tex. App.—Corpus Christi–Edinburg 2015), *rev'd*, 526 S.W.3d 453 (Tex. 2017), the Texas Supreme Court reversed this Court's holding affirming the denial of the hospital's motion to dismiss and remanded the case to the trial court in order to allow Zamarripa a thirty-day extension to amend her report. A subsequent case, *Zamarripa v. Columbia Valley Health Care System, L.P.*, 13-18-00231-CV, 2019 WL 962085 (Tex. App.—Corpus Christi–Edinburg 2019, pet. filed), reversed the trial court's granting of a motion to dismiss filed by the hospital. The facts as we previously laid out in the above cases have not changed.

In this particular case, Zamarripa's second amended petition was filed on April 21, 2014, and her expert report from Dr. Harlass was filed on July 24, 2014. A second report from Dr. Harlass was filed on July 30, 2014. The case was abated due to the other appeals as listed above, although Gonsoulin's objections to Dr. Harlass's expert report

---

[1] Dr. Gonsoulin filed a post-submission letter attempting to include an order from *Zamarripa v. Bay Area Health Care Group, Ltd.*, No. 13-15-00024-CV, 2016 WL 6962009 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied), into this record. Zamarripa filed a letter objecting to the inclusion of the order from the prior case. We did not consider Gonsoulin's letter in the disposition of this case.

were overruled on November 4, 2014. The case was reinstated after the Texas Supreme Court handed down its opinion in 2017. *See Zamarripa*, 520 S.W.3d at 62.

Gonsoulin filed a motion to dismiss on January 23, 2018. Zamarripa filed an objection and motion to strike Gonsoulin's motion to dismiss on March 2, 2018. On April 6, 2018, the trial court issued an order titled "Order Sustaining Objection and Granting 30 Day Extension." The order stated:

> The Objections and Motion to Strike filed by Plaintiff with regard to the Motion to Dismiss filed by Defendant Gonsoulin. After due consideration of the pleadings on file, the arguments of counsel, and the pertinent case law, the Court finds that cause exists upon which to sustain the objections and grant a 30 day [sic] extension to cure any deficiency. It is, therefore,
>
> ORDERED, ADJUDGED, AND DECREED, that the objections of Plaintiff to Defendant Gonsoulin's Motion to Dismiss are hereby sustained and a 30 day extension is hereby granted to cure any deficiency in the expert's report.

The statement regarding a thirty-day extension was hand-written on the order.[2]

After thirty days had passed, Gonsoulin filed a supplemental motion to dismiss which requested statutory dismissal for failure to produce an expert report that complied with chapter 74. *See* TEX. CIV. PRAC. & REM. CODE ANN. ch. 74. Zamarripa filed a response and motion to strike Gonsoulin's motion to dismiss. The trial court held a hearing and the following occurred:

> Zamarripa: So this Court sustained our objections, the Plaintiffs' objections, to the Defendant's motion to dismiss, and so therefore–so then with the Court granting our motion—our motion to strike, there's nothing for us, the Plaintiffs, to do. It sustained our objections to their motion because, again—
>
> Trial Court: But I gave you a remedy of 30 days, Counsel, to supplement that particular expert, if I'm not mistaken.

---

[2] The trial court also handwrote "Granting 30 Day Extension" to the title of the order.

Zamarripa:  And, Your Honor, if—that's not the way that the Order reads. The Order says that the "Objections of Plaintiff to Defendant Gonsoulin's Motion to Dismiss are hereby sustained," and that's where—and so with the Order being in front of us as it is, that's—that's the way that we—we have to interpret what the Order says.

And so because of our objections and the Court granting our objections to their motion to dismiss, then there's nothing to–there's nothing for us to cure because in 2014 this Court overruled their objections and they never appealed, and then with this Court's order, it again overruled their objections and didn't find any deficiencies so there's nothing to cure, Your Honor.

. . . .

Trial Court:  Oh, okay. So you're saying you're good even though I told you there is a deficiency and I'm only sustaining it so that you can cure it within 30 days—otherwise, I would have just dismissed it, Counsel, but I didn't. I gave you 30 days to cure it.

. . . .

Trial Court:  So you misunderstood my Order? Is that what I'm hearing?

Zamarripa:  Judge—well, our reading of the Order is that.

Trial Court:  That's what happens when attorneys interpret Orders, counsel.

All right. So therefore you feel there's no need for you to cure the deficiency? Is that what I'm hearing?

. . . .

Zamarripa:  Okay. And then with the granting of our objections to their motion to dismiss, the Court again didn't find any deficiencies.

Trial Court:  There is an "and." There's an "and."

Zamarripa:  I understand that, Judge, but it doesn't say, "And the Court finds that there is deficiencies." [sic]

4

Trial Court: Let's see. "And a 30-day extension is hereby granted to cure any deficiency in the expert's report." I don't think I can be any more clear [sic] than that, Counsel. I was very specific on my Order, and there was a reason why I was that specific; because I didn't want to hear the argument that you're making right now. I specifically gave you-all time to cure; otherwise, I would have just stricken it, and I didn't. I gave you an opportunity to cure it, and you didn't cure it.

. . . .

Trial Court: You leave me no other choice than to grant their motion to dismiss because you said, oh, it's good the way it is, Judge, we don't need to do anything with it.

. . . .

Trial Court: Well I'm interpreting it for you since I'm the one that signed it and I'm the one that added "and" in there, and whenever you see an "and," that means its one and two, and [sic]. It didn't say "or." It said "and," and it said give you time to cure.

So if I'm giving you time to cure something, that means that it's deficient, right? You should have filed a motion to clarify the Judge's order, and then I would have heard you, and then I would have told you exactly what I'm telling you right now.

. . . .

Zamarripa: Well, Judge, if it was a misinterpretation on our part, Plaintiffs will humbly request from the Court a 30-day extension from today to cure any deficiencies. If that's the case, the Plaintiffs should not be punished for a misinterpretation that–

. . . .

Trial Court: I am inclined to give you your 30 days; however, I'm going to be entertaining attorneys' fees at the next hearing because that's on you. That's not on them. They're here. They're ready to proceed. They have a proper motion to dismiss before me. You should have filed a motion to clarify if your interpretation was different than what I was telling you.

. . . .

5

Gonsoulin:   This will be—next time will be the sixth hearing.

Trial Court:   I understand that, but obviously you are very intent on this motion, and I can appreciate your perseverance on this particular issue.

So it will be 30 days out. I will be entertaining attorneys' fees at that time. Bring me a breakdown at that time, Counsel, and I'll deal with it at that point.

On July 12, 2018, Zamarripa filed a supplemental expert report by Dr. Steven Edmonson. After the second thirty-day period had passed, Gonsoulin filed a second supplemental motion to dismiss. Zamarripa filed another response and motion to strike Gonsoulin's motion to dismiss. On July 30, 2018, the trial court overruled Gonsoulin's objections, denied the second supplemental motion to dismiss, but awarded Gonsoulin $3,051.23 in attorney's fees. This appeal followed.

## II.   JURISDICTION

Zamarripa argues that this Court does not have jurisdiction to review the trial court's denial of Gonsoulin's motion to dismiss. She states that the trial court denied Gonsoulin's motion to dismiss in 2014 and he failed to properly appeal the denial at that time.

In 2014, Gonsoulin filed two motions objecting to Dr. Harlass's report. One was titled, "Defendant, Whitney Gonsoulin, M.D.'s Objections to Ch. 74 Report of Frederick Harlass, M.D." and the other was titled, "Defendant, Whitney Gonsoulin, M.D.'s Objections to Ch. 74 Report of Frederick Harlass, M.D. served by Intervenor Olga Flores as Temporary Administrator of the Estate of Yolanda Iris Flores." The motions were similar except that the motion related to the intervenor requested that the objections be

6

granted and the case be dismissed. On November 4, 2014, the trial court issued an order that overruled Gonsoulin's objections. Zamarripa argues that the 2014 objections were actually a motion to dismiss and Gonsoulin should have appealed the trial court's order at that time.

Section 74.351(a) provides that within 120 days of filing an original petition in a health care liability claim, a plaintiff must serve on each defendant an expert report, along with the expert's curriculum vitae. *See id.* § 74.351(a); *see also CHCA Mainland, L.P. v. Burkhalter*, 227 S.W.3d 221, 225 (Tex. App.—Houston [1st Dist.] 2007, no pet.). An expert report is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

Section 74.351(*l*) provides the proper basis for lodging objections to the adequacy of an expert report. *See id.* § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)."). Although an interlocutory appeal may be taken from an order that "grants relief sought by a motion under Section 74.351(*l*)," a defendant has no right of interlocutory appeal if the trial court denies the defendant's challenge to the adequacy of an expert report under § 74.351(*l*). *Id.* § 51.014(a)(10).

An expert report may be deemed untimely filed under § 74.351(a) if the report is served before the 120–day deadline, but deficient. *Acad. of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184, 187 n. 5 (Tex. App.—Austin 2005, no pet). If an adequate expert report "has not been served" within the 120–day period, the court, on the defendant's motion, shall, subject to § 74.351(c), enter an order that "awards to the affected physician or health care provider reasonable attorney's fees and costs of court" and "dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim." *Id.* § 74.351(b). A person may appeal from an interlocutory order that "denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351." *Id.* § 51.014(a)(9); *see id.* § 74.351(c).

Here, like in *Mainland*, although one of Gonsoulin's objections requested dismissal, the trial court's order did not rule on Gonsoulin's request to dismiss the case pursuant to § 74.351. *Id.* § 74.351; *see Mainland*, 227 S.W.3d at 225. The trial court only ruled on Gonsoulin's objections to Dr. Harlass's expert report. In order to complain of an error on appeal, the record must show that the trial court either expressly or impliedly ruled on the request, objection, or motion. *See* TEX. R. APP. P. 33.1(a)(2)(A). It was only after Gonsoulin filed his motion to dismiss in 2017 that the trial court issued an order denying the motion to dismiss. Therefore, we have jurisdiction over the instant appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9).

### III.    CHAPTER 74 REPORT

By his sole issue, Gonsoulin argues the trial court erred by denying his motion to

8

dismiss.

## A.	Timeliness of Supplemental Report

The Texas civil practice and remedies code chapter 74 controls expert report

timelines. *See* TEX. CIV. PRAC. & REM. CODE Ann. ch. 74. In § 74.351(c), it states:

> If an expert report has not been served within the period specified by
> Subsection (a) because elements of the report are found deficient, the court
> may grant one 30-day extension to the claimant in order to cure the
> deficiency. If the claimant does not receive notice of the court's ruling
> granting the extension until after the 120-day deadline has passed, then the
> 30-day extension shall run from the date the plaintiff first received notice.

*Id.* § 74.351(c).   Subsection (b) goes on to state that:

> If, as to a defendant physician or health care provider, an expert report has
> not been served within the period specified by Subsection (a), the court, on
> the motion of the affected physician or health care provider, shall, subject
> to Subsection (c), enter an order that:
>
> (1)	awards to the affected physician or health care provider reasonable
> attorney's fees and costs of court incurred by the physician or health
> care provider, and
>
> (2)	dismisses the claim with respect to the physician or health care
> provider, with prejudice to the refiling of the claim.

*Id.* § 74.351(b).

However, this case was unusual. Although the trial court believed it signed the

order granting Gonsoulin's objections to Zamarripa's expert report based on statements

it made during the June 2018 hearing, it signed an order that technically granted

Zamarripa's objections to Gonsoulin's objections to the expert report. It is apparent from

the June 2018 record that Zamarripa was unaware that the trial court found deficiencies

in her expert's report. The trial court stated that it should have been clear there were

deficiencies in Zamarripa's expert report because it allowed Zamarripa thirty days to cure

9

any deficiency, but based on the wording of the order, we find the order was contradictory and ambiguous. *See Lone Star Cement Corp. v. Fair*, 467 S.W.2d 402, 404–05 (Tex. 1971) ("The same rules of interpretation apply in construing the meaning of a court order of judgment as in ascertaining the meaning of other written instruments.").

Generally, an "ambiguous order may be construed in light of the motion upon which it was granted." *Id.* at 404. Here, the trial court necessarily denied Gonsoulin's objections to the expert report when it granted Zamarripa's motion to dismiss. Thus, the trial court's granting of a thirty-day extension to amend the expert report is in irreconcilable conflict with this ruling. Due to this conflict, the trial court's April 2018 order is of no effect. *See Houston v. Adams*, 269 S.W.2d 572, 577 (Tex. App.—Galveston, 1954, no writ) (explaining that *c*onflicting orders obviate one another because a trial judge cannot grant and deny mutually exclusive remedies at the same time); *cf. USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 509 (Tex. 2018) ("When an irreconcilable conflict involves one jury answer that would require a judgment in favor of the plaintiff and another that would require a judgment in favor of the defendant, the conflict is fatal."). The trial court's oral clarification during the June 2018 hearing explaining its decision is what we construe to be the "order" which starts Zamarripa's thirty-day timeline. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). Therefore, Zamarripa's supplemental expert report was timely.

## B.      Sufficiency of the Report

### 1.      Standard of Review

The standards governing the contents of expert reports required by chapter 74 are

well established. *Hebert v. Hopkins*, 395 S.W.3d 884, 889 (Tex. App.—Austin 2013, no pet.). Chapter 74 defines an "expert report" as a

> fair summary of the expert's opinion as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

A trial court's ruling on the sufficiency of an expert's report is reviewed for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). Under this review, we defer to the trial court's factual determinations if they are supported by the evidence but review its legal determinations de novo. *Id.* A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Id.* However, in exercising its discretion, it is incumbent upon the trial court to review the reports, sort out their content, resolve any inconsistencies, and decide whether the reports demonstrate a good faith effort to show that the plaintiff's claims have merit. *Id.* at 144; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*).

To constitute a "good faith effort," as the Texas Supreme Court has explained, the report must include the expert's opinion on "each of the three main elements: standard of care, breach, and causation," and must provide enough information to fulfill two purposes with respect to each element: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *See Jelinek v. Casas*, 328 S.W.3d 526, 538–40 & n.9 (Tex. 2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873,

11

878–79 (Tex. 2001). A plaintiff does not need to present all of her proof or expert testimony in a form that would be admissible at trial, but is required to have the expert "explain the basis for his statements to link his conclusions to the facts" and not merely state conclusions. *Jelinek*, 328 S.W.3d at 539–40. The supreme court held that "'[a] report that merely states the expert's conclusions about the standard of care, breach, and causation' does not fulfill the two purposes of a good-faith effort." *Id.* at 539 (quoting *Palacios*, 46 S.W.3d at 879).

### 2. Applicable Law and Discussion

Gonsoulin argues that the causation element was not met in Dr. Edmonson's report. This element requires that the expert explain "how and why" the alleged negligence caused the injury in question. *Jelinek*, 328 S.W.3d at 536. A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id.* at 539; *see also Zamarripa*, 526 S.W.3d at 461 ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which. . . are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Zamarripa*, 526 S.W.3d at 460.

Dr. Edmonson laid out what he believed the breaches of care were:

1.      Dr. Gonsoulin failed to direct that additional laboratory tests be performed prior to transfer and failed to acquire sufficient facts to appreciate the severity of patient's condition. Dr. Gonsoulin failed to direct that the fibrinogen level be repeated; he failed to direct that a complete blood count be repeated to determine Ms. Flores [sic] hematologic status prior to transfer; and he failed to direct that prothrombin time and partial

12

thromboplastin time be done to determine Ms. Flores [sic] coagulation status prior to transfer.

2.      Dr. Gonsoulin failed to recommend initiation of tocolytic therapy (treatment for the contractions).

3.      Dr. Gonsoulin failed to direct transfer to closer facility with the capacity and similar capabilities.

4.      Dr. Gonsoulin failed to direct an appropriate mode of transportation for patient's condition.

As to causation, Dr. Edmonson opined:

1.      Ms. Flores was anemic on admission to VRMC earlier in the morning of the transfer, with a hemoglobin [sic] 8.3 and a hematocrit of 24.4. Given the reason for transfer was a placenta accreta, a condition in which life-threatening hemorrhage and coagulopathy was highly probable; and the high probability of a placental abruption; the standard of care would dictate rechecking the hemoglobin and hematocrit levels to ascertain if the anemia was worsening due to ongoing bleeding. Furthermore, Ms. Flores [sic] fibrinogen level was low at 242 mg/dl. Fibrinogen levels correlate with the severity of bleeding and failing fibrinogen levels may indicate a disseminated coagulopathy (inability of her blood to clot and control hemorrhaging). Fibrinogen levels below 200 have a 100% positive predictive value for placental abruption. Because of the risk of hemorrhage and subsequent risk of a disseminated coagulopathy, the standard of care required that the fibrinogen level be rechecked and that additional studies of the patients' coagulation system be done to determine the patient's coagulation status prior to transfer.

By directing that these tests be performed, Dr. Gonsoulin would have known the severity of Ms. Flores [sic] condition. He would have known whether her anemia had worsened and that she had a problem with her blood clotting. This information was necessary to ascertain the stability of Ms. Flores [sic] placental condition and whether there was active hemorrhaging prior to transfer. Dr. Gonsoulin's failure to direct that these tests be done prior to the transfer deprived Ms. Flores of additional stabilizing treatment. More specifically, given the level of anemia and the significant risk of hemorrhage associated with Ms. Flores [sic] condition, transfusion of blood should have been given to Ms. Flores prior to her transfer. Secondly, with the low fibrinogen levels and the probability of a developing a coagulopathy (inability for her blood to clot) transfusion of blood clotting factors should have been considered prior to transfer. There was ample time during Ms.

13

Flores' hospitalization at VRMC prior to the transfer to have repeated these tests and ascertain the need for additional stabilizing treatment.

Ms. Flores had a placenta accreta and was having ongoing intraabdominal hemorrhage complicated by a placental abruption. With a placenta accreta and placental abruption, blood loss may be far in excess of what is observed due to retained retroplacental or intraabdominal bleeding. A placenta accrete is a condition that occurs because of a defect in the basal decidual tissue of the uterus; whereas a placental abruption is the result of ruptured blood vessels in this decidual layer. Bleeding occurs from these ruptured blood vessels separating the placenta from the uterine wall. Both conditions represent a chronic placental disease. There was ample evidence in the record to substantiate the existence of the placenta accrete and the high risk of placental abruption well before Ms. Flores presented to the hospital on 5/15/2012. A cesarean hysterectomy was necessary to stop the hemorrhaging, however, rather than receiving this care at VRMC, she was transferred to CCMC-BA over 150 miles away. Time was critical for Ms. Flores, the sooner she received the definitive surgical care, the lower the risk of deterioration in her condition. Providing the additional stabilizing treatment such as blood and blood product transfusions would have lessened the risk of deterioration in her condition and provided additional time for Ms. Flores' transfer to be completed. The failure to appreciate the severity of her condition and the high probability of deterioration, and the failure to provide additional stabilizing treatment allowed the existing anemia to worsen from continued bleeding; and the coagulopathy to develop and progress much more quickly. The coagulation cascade was triggered by the ongoing hemorrhage, depleting Ms. Flores [sic] clotting factors and platelets resulting in an inability for her blood to clot. With the inability for her blood clot, Ms. Flores, who was already severely anemic, continues to hemorrhage. She exsanguinates, she hemorrhages to the point of cardiovascular collapse. Because Dr. Gonsoulin did not direct that additional lab testing be done and because of his failure to direct that blood transfusions be given to Ms. Flores prior to her transfer, she was deprived of stabilizing treatment that would have given her critical time needed for her transfer. Ms. Flores [sic] death was a consequence of the failure to receive additional stabilizing treatment.

2.     Ms. Flores was contracting throughout the day and no treatment was provided for these contractions other than IV fluids. Preterm contractions are often a sign of placental abruption and these contractions aggravate the placental condition. These contractions are caused by thrombin, a powerful uterotonic (stimulates contractions) which leads to further placental separation. A patient with a placental abruption may initially be stable, however the placental abruption may progress suddenly with rapid

14

deterioration. Therefore, the continuation of the contractions throughout the day and during the transfer contributed to the worsening of the placental condition and hemorrhage. Dr. Gonsoulin's failure to direct treatment for these contractions contributed to the worsening of her placental condition, exacerbating the hemorrhaging thus accelerating her blood loss and inability to clot her blood. Because of Dr. Gonsoulin's failure to direct treatment for these contractions prior to and during the transfer, the contractions continued and aggravated the existing placental condition leading to further hemorrhage and problems with blood clotting, ultimately contributing to her cardiovascular collapse and death from hemorrhaging.

3.      Given the patient's condition, the transfer should have been directed to a closer facility than CCMC-BA, since CCMC-BA was over 150 miles away from VRMC. Transfer to a closer facility would have shortened the time of transfer and facilitated definitive treatment prior to Ms. Flore's [sic] condition deteriorating to point of her death. Shortening of the transit time was critical because Ms. Flores' hemorrhaging and inability to clot her blood was untreated prior to her transfer and therefore ongoing and worsening during the transfer. Because Dr. Gonsoulin did not direct transfer to a closer facility, Ms. Flores' 3 hour transfer deprives her of critical time as she continues to hemorrhage from her placental condition. The consequence of Dr. Gonsoulin's failure is a delay in treatment due to the distance she was transferred, allowing the hemorrhaging and inability to clot her blood to accelerate to the point that she bled to death.

4.      Given the nature and severity of this patient's unstable condition, transport time was of paramount importance. Ground transport is best for short distance transfer, but there is increased transit time when the transfer is over a long distance, furthermore, the mobility of a ground vehicle is limited by road and traffic conditions. Air transport via helicopter has a shorter transport time, and is best over intermediate distances and/or in highly congested areas were [sic] traffic conditions would extend the transit time. Ms. Flores was transferred non-emergently by ground ambulance, the unit became ensnared in a traffic jam during a critical period in which Ms. Flores [sic] condition had significantly deteriorated. Hidalgo EMS had to be escorted by Corpus Christi fire personnel to the receiving hospital due their unfamiliarity with the area further adding to the delay in care. Air transport would have avoided these traffic issues and shortened the transit time. As stated previously, the time to definitive surgery, i.e. cesarean hysterectomy[,] was critical and the standard of care would have been to transfer Ms. Flores in the most expeditious manner appropriate for the severity of her condition so as to avoid deterioration during the transfer. Transfer by ground vehicle, non-emergently over a distance of 150 miles posed a significant delay in receiving the definitive surgery needed by Ms.

15

Flores. Because of Dr. Gonsoulin's failure to direct a more appropriate mode of transfer of Ms. Flores, the resultant time delay allowed more time for the untreated hemorrhaging and blood clotting defects at work in Ms. Flores to continue and worsen, ultimately causing her death.

Dr. Edmonson's report explained how and why he thought Gonsoulin was deficient by his actions. *See Abshire v. Christus Health Southeast Texas*, 563 S.W.3d 219, 224 (Tex. 2018). The report explained the basis of his statements and linked his conclusions to specific facts that occurred. *See id.* Dr. Edmonson's report explained the cause-in-fact omissions he felt led to the harm and ultimate death of Flores. *See Zamarripa*, 526 S.W.3d at 460. We conclude that Dr. Edmonson's report was sufficient to qualify as a "good-faith" effort to comply with the causation requirement under § 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *see also Abshire*, 563 S.W.3d at 224. We hold the trial court did not abuse its discretion in denying Gonsoulin's motion to dismiss. We overrule Gonsoulin's sole issue.

## IV.    CONCLUSION

We affirm the ruling of the trial court.

GINA M. BENAVIDES,
Justice

Delivered and filed the
20th day of February, 2020.

16