# IN THE SUPREME COURT OF TEXAS

No. 17-0386

SUE ABSHIRE, PETITIONER,

v.

CHRISTUS HEALTH SOUTHEAST TEXAS D/B/A CHRISTUS HOSPITAL–ST. ELIZABETH, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

**PER CURIAM**

The Texas Medical Liability Act requires a health care claimant to furnish a written expert report early in the proceedings summarizing the applicable standards of care and explaining how the provider's alleged negligence caused the claimant's injury. In this case, the court of appeals held that the claimant's expert report was insufficient as to causation with respect to one of her providers and dismissed her claims against that provider. We hold that the expert report adequately addressed both causation and the standard of care. Accordingly, we reverse the court of appeals' judgment and remand this case to the trial court for further proceedings.

On November 19, 2012, Sue Abshire visited the emergency room at Christus Hospital–St. Elizabeth (Christus), complaining of pain in her chest and back.[1] Her attending physician

---

[1] The facts recited are in accordance with those alleged in Abshire's petition and expert reports.

administered two EKGs, both of which returned normal results.  Abshire was discharged the next day with instructions to follow up with a cardiologist.  No spinal evaluation was conducted, and Abshire's medical history failed to note that she suffered from osteogenesis imperfecta (OI)—commonly known as brittle bone disease.[2]

On November 22, Abshire returned to the Christus emergency room and was admitted for chest pain and breathing difficulties.  This time her OI history was noted, as well as her blue sclera—a common symptom of OI.[3]  However, the physician ordered only a chest x-ray.  Abshire was released from the hospital that same day.

The next day, Abshire again returned to the Christus emergency room with the same complaints of chest pain.  This time, however, she reported pain in her shoulder, neck, and back in addition to the pain in her chest.  Her history of OI was noted during this visit.  Abshire was sent home with a diagnosis of constipation, musculoskeletal pain, and pleurisy.[4]

On November 29, less than a week later, Abshire was transported to the Christus emergency room by ambulance for shortness of breath, chest pain, and back pain.  Abshire's OI was not documented in her medical history during this visit.  Another chest x-ray revealed degenerative changes in her shoulders and spine.  Abshire was then admitted to the hospital, whereupon another physician confirmed these degenerative changes, noting probable bone

---

[2] According to one of the expert reports, individuals affected by OI have "bones that fracture easily, loose joints and muscle weakness, . . . tendency toward spinal curvature, and bone deformity."

[3] Sclera are the whites of the eyes.

[4] Pleurisy is an inflammation of the tissue lining in the lungs.  Common symptoms include chest pain and difficulty breathing.  *Pleurisy: What You Should Know*, WebMD, https://www.webmd.com/lung/understanding-pleurisy-basics#1.

necrosis. Abshire remained in the hospital until December 2, during which time her OI was not documented in her chart. No further musculoskeletal assessment was performed.

Abshire visited the Christus emergency room for the fifth time on December 3, the day after her previous discharge. This time, Abshire reported weakness in her legs and difficulty walking. Abshire was transferred to HealthSouth Rehabilitation Hospital and remained there for two days, complaining of an "electrical voltage" shooting down her shoulders, back, and legs, severe leg weakness, and loss of bowel and bladder control. The rehab physician noted Abshire's history of OI and planned to have an MRI performed on Abshire's lumbar spine. In the meantime, she was put on a physical therapy regimen.

When physical therapy failed to improve her symptoms, Abshire was sent back to Christus for further evaluation on December 5 and was again medically cleared. Christus attempted to send Abshire back to HealthSouth, but her rehab physician intervened and instead had her transferred to another hospital, Baptist Beaumont.

Upon hearing Abshire's complaints of back pain and leg immobility, the Baptist Beaumont physicians ordered an MRI of her spine. The MRI revealed that Abshire suffered from a compression fracture of her T-5 vertebrae.[5] This injury ultimately rendered Abshire a paraplegic and incontinent.

After back surgery failed to cure her paraplegia, Abshire sued Christus, HealthSouth, and two Christus physicians for negligence.[6] Only her claim against Christus for vicarious liability,

---

[5] The expert report notes that compression fractures are "commonly seen" in patients with OI. In severe cases, coughing or sneezing can cause such fractures.

[6] Abshire named as defendants Christus Health Southeast Texas d/b/a Christus Hospital–St. Elizabeth, Frank Fasullo, M.D., Sidney Marchand, M.D., and HealthSouth Rehabilitation Hospital of Beaumont, LLC d/b/a HealthSouth Rehabilitation Center–Beaumont.

3

premised on the alleged negligence of its employee nurses, is at issue here.[7] As to that claim, Abshire alleged in her petition that the Christus nurses who attended her "failed to recognize the signs and symptoms of a spinal compression fracture resulting in a delay in treatment which caused Ms. Abshire's paraplegia" and "missed the history of [OI] that predisposes one to fractures."

To support these allegations, Abshire served an expert report prepared by Dr. Lige B. Rushing, a physician board-certified in internal medicine, geriatrics, and rheumatology. This report primarily addressed the conduct of the Christus physicians and summarily opined that "had [Christus] followed the Standard of Care for patients with OI, Ms. Abshire in medical probability would not have developed paraplegia and bowel and bladder incontinence."

Christus filed an objection to Dr. Rushing's report, arguing that it did not sufficiently establish the applicable standards of care, the manner in which Christus breached those standards, and the causal link between Christus's conduct and Abshire's injuries. Christus also filed a motion to dismiss arguing the report was deficient in that it (1) failed to show how the hospital (via its employees—the nurses) rather than the physicians (who were not Christus's employees) breached the standard of care, and (2) rendered conclusory opinions on causation.

The trial court agreed with Christus's objections and granted Abshire a thirty-day extension to address the report's deficiencies. Abshire timely filed a supplemental report from Dr. Rushing and an additional report from Erika L. Aguirre, a registered nurse, discussing the standard of care and breach by Christus's nursing staff. Christus challenged these reports' sufficiency as well and again moved to dismiss Abshire's claims. After a hearing, the trial court denied Christus's motion

---

[7] Abshire and HealthSouth have settled, and the physicians did not appeal the trial court's denial of their motions to dismiss.

4

to dismiss, concluding that the supplemental reports constituted a good faith effort to comply with the statutory requirements.

The court of appeals reversed and dismissed Abshire's claims against Christus, holding that Dr. Rushing's report, even as supplemented, did not show how the nurses' failure to document Abshire's OI caused her paraplegia. ___ S.W.3d ___, ___ (Tex. App.—Beaumont 2017). As such, the report suffered from an "analytical gap" that rendered the report deficient. *Id.* at ___. Because the court of appeals found the report insufficient as to causation, it declined to address the report's sufficiency regarding the standard of care. *Id.* at ___. We disagree with the court of appeals' causation analysis and hold that the report sufficiently addresses both causation and the standard of care.

Chapter 74 of the Civil Practice and Remedies Code, also known as the Texas Medical Liability Act, requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed. TEX. CIV. PRAC. & REM. CODE § 74.351(a). We have previously explained that the purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims. *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) ("[Expert report] requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed."). In accordance with that purpose, the Act provides a mechanism for dismissal of the claimant's suit in the event of an untimely or deficient report. TEX. CIV. PRAC. & REM. CODE § 74.351(b).

5

An expert report is sufficient under the Act if it "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between the failure and the injury." *Id.* § 74.351(r)(6). Importantly, the trial court need only find that the report constitutes a "good faith effort" to comply with the statutory requirements. *Id.* § 74.351(l); *see also Palacios*, 46 S.W.3d at 878. We have held that an expert report demonstrates a "good faith effort" when it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). A report "need not marshal all the claimant's proof," but "a report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Palacios*, 46 S.W.3d at 878–79.

We review a trial court's decision to grant or deny a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Id.* at 877. In analyzing a report's sufficiency under this standard, we consider only the information contained within the four corners of the report. *Id.* at 878. However, one expert need not address the standard of care, breach, and causation; multiple expert reports may be read together to determine whether these requirements have been met. TEX. CIV. PRAC. & REM. CODE § 74.351(i). Here, we must look to both Dr. Rushing's and Nurse Aguirre's reports to determine whether the trial court abused its discretion in concluding that those reports, considered together, demonstrated a good faith effort to comply with the Act's requirements.[8]

---

[8] Nurse Aguirre's report speaks only to standard of care and breach, while Dr. Rushing's report also speaks to causation. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(C) (only a qualified physician may render an opinion on causation).

We initially turn to causation, the primary issue of this appeal. This element requires that the expert explain "how and why" the alleged negligence caused the injury in question. *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id.* at 539; *see also Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Zamarripa*, 526 S.W.3d at 460.

Dr. Rushing's report twice addresses the issue of causation. First, in the section addressing the standard of care applicable to the Christus nurses,[9] Dr. Rushing explains:

> The lack of properly assessing Ms. Abshire's medical history and physical conditions is a breach in the standard of care. Lack of information results in a delay in proper medical care and is an impediment for the managing doctor to be able to order appropriate testing, and prescribe proper treatment and preventative care. In Ms. Abshire's case, had the symptomology that Ms. Abshire was experiencing been appropriately linked to the [OI] diagnosis then the proper course of care would have been to admit the patient to the hospital on absolute bed rest, order imaging studies such as a CT or MRI of her back, then treat the injury to the spine . . . by such methods as bracing through spinal fusion. The goal would be to alleviate pressure on the spine such that the compression fracture does not progress and paraplegia does not occur.

In a subsequent section titled "Causal Relationships," Dr. Rushing opines:

> The harm/injury that resulted from the substandard care provided by [Christus] was the exacerbation of an undiagnosed vertebral fracture that lead [sic] to a spinal cord injury resulting in paraplegia and bowel and bladder incontinence.

---

[9] The location of the discussion within the report has no bearing on its sufficiency. *See Baty*, 543 S.W.3d at 694 (noting that we "view the report in its entirety, rather than isolating specific portions or sections").

Failure of the nursing staff to document a complete and accurate assessment resulted in a delay in proper medical care (ie. [sic] the ordering of imaging studies and protection of the spine.). . . . [H]ad the symptomology that Ms. Abshire was experiencing been appropriately linked to the [OI] diagnosis then she could have been admitted to the hospital on absolute bed rest, imaging studies such as a CT or MRI of her back ordered, then treatment started to preserved [sic] the integrity of the spine. . . .

The hospital staff clearly ignored signs and symptoms of spinal injury and kept investigating the same areas over and over with no relief to the patient. . . . This failure on the part of the hospital staff allowed the spinal injury to progress to the point of paraplegia.

Failure to consider the patient's prior relevant medical history was mostly [sic] likely a cause of the hospital staff's focus on the potential cardiac element of Ms. Abshire's pain. . . . Had they had a complete medical history they would have known to examine other areas and that this patient had a high probability of a compression fracture. The lack of proper documentation in the patient's medical record lead [sic] to a delay in treatment of Ms. Abshire's compression fracture which in medical probability lead [sic] to paralysis.

In our view, Dr. Rushing's explanation provides a straightforward link between the nurses' alleged breach of the standard of care and Abshire's spinal injury. That is, the report draws a line directly from the nurses' failure to properly document Abshire's OI and back pain, to a delay in diagnosis and proper treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia).

We find support for this conclusion in *Miller v. JSC Lake Highlands Operations*, in which we found very similar language satisfied the causation requirement. 536 S.W.3d 510, 515 (Tex. 2017) (per curiam). In that case, a resident of an assisted-living facility swallowed her dental bridge and died shortly after it was extracted. *Id.* at 512. Although x-rays revealing the bridge's presence in the patient's trachea had been taken when she began showing signs of chest congestion, the reviewing physician failed to notice or identify the problem. *Id.* The expert reports concluded

8

that the physician breached the standard of care by failing to detect the dental bridge in the x-rays and that the corresponding delay in discovering and removing the bridge caused a series of pulmonary issues that ultimately resulted in the patient's death. *Id.* at 514. We held that this was a "more-than-adequate summary" of causation, as it explained how the physician's breach—failing to identify the bridge and alert appropriate personnel—delayed timely removal, which in turn caused the patient to aspirate. *Id.* at 515. Similarly here, Dr. Rushing explained how the nurses' breach—failing to consistently document Abshire's OI, particularly in light of her continued complaints of back pain—caused a delay in diagnosis and proper treatment and why that delay caused the issues that led to Abshire's paraplegia. Thus, the report adequately explained the links in the causal chain.

Despite this identified causal link, the court of appeals held that the report was conclusory because it "fail[ed] to explain how the nurses' alleged failure to document OI was a substantial factor in causing or exacerbating Abshire's injuries . . . or that it would have changed the outcome." ___ S.W.3d at ___. Specifically, the court observed that the physicians did not order tests or provide spinal treatment on either the November 22 or 23 visits, even though Abshire's OI was noted during these visits. *See id.* at ___. Therefore, the court held that Dr. Rushing's "opinion that the nurses' failure to chart Abshire's history of OI caused Abshire's injury rests on an analytic gap that renders his causation opinion as to the nurses conclusory." *Id.* at ___.

We disagree that such an analytic gap exists.[10] As explained above, Dr. Rushing's report adequately links his conclusion with the underlying facts (failure to properly document Abshire's

---

[10] This Court has not used the term "analytic gap" or "analytical gap" in this context, though the courts of appeals often do. *See, e.g., THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 914, 922 (Tex. App.—El Paso 2016, no pet.) ("[A] report may not have an 'analytical gap' or a 'missing link' between the expert's allegation that the physician

9

medical history was a substantial factor in her delayed treatment and subsequent injury). Rather, it appears the court of appeals simply did not agree with his conclusions in light of Abshire's overall course of treatment. However, the court's job at this stage is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory.

Again, our opinion in *Miller* is instructive. There, we disagreed with the court of appeals' conclusion that the expert report regarding the assisted-living facility's conduct failed to articulate the applicable standard of care, noting that "the court of appeals' real concern appears to be the *believability* of [the expert's] articulated standards of care, not the manner in which she stated them." *Miller*, 536 S.W.3d at 516. We rejected such an inquiry, explaining that at "this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort." *Id.* at 516–17. In the same vein, with respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings.

The ultimate evidentiary value of the opinions proffered by Dr. Rushing and Nurse Aguirre is a matter to be determined at summary judgment and beyond. In this regard, the court of appeals improperly examined the merits of the expert's claims when it identified what it deemed an "analytical gap." But at this stage we do not require a claimant to "present evidence in the report

---

defendant breached the standard of care and the plaintiff's injuries."); *see also Christus Spohn Health Sys. Corp. v. Hinojosa*, No. 04-16-00288-CV, 2016 WL 7383819, at *5–6 (Tex. App.—San Antonio Dec. 21, 2016, no pet.) (mem. op.). It appears that the courts have generally used this term to mean a failure to link the breach of the standard of care to the injury, which comports with this Court's discussion of chapter 74's expert report requirements with respect to causation. *See Zamarripa*, 526 S.W.3d at 460 (holding that an expert report sufficiently addresses causation where it "explain[s] the basis of [the expert's] statements to link [the] conclusions to the facts").

as if it were actually litigating the merits." *Palacios*, 46 S.W.3d at 879. We hold that Dr. Rushing's supplemented report constitutes an objective, good faith effort to comply with the Act's requirement to provide a fair summary of his opinion with respect to the causal relationship between Christus's alleged breach and Abshire's injury. TEX. CIV. PRAC. & REM. CODE § 74.351(l), (r)(6).

Christus argues that, even if Dr. Rushing's report is sufficient as to causation, the trial court nevertheless erred in denying Christus's motion to dismiss because the reports fail to articulate the applicable standard of care. The court of appeals did not address this issue, but the parties have briefed it here, and we will consider it. TEX. R. APP. P. 53.4; *Baty*, 543 S.W.3d at 697.

To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. While the Act requires only a "fair summary" of the standard of care and how it was breached, "even a fair summary must set out what care was expected, but not given." *Id.* (quotation omitted). For example, in *Palacios*, we held that an expert's opinion that the hospital did not take proper precautions to prevent a patient from falling did not sufficiently address the standard of care because it failed to apprise the parties of the specific conduct complained of—be it a failure to monitor more closely, restrain more securely, or something else altogether. *Id.*

Both Dr. Rushing's and Nurse Aguirre's reports address the standard of care for the Christus nurses. First, Dr. Rushing's report states:

**The Nurses:**

> **The standard of care is to document a complete and accurate assessment.**

11

> The nurses failed on multiple occasions to document a complete and accurate assessment of the patient. During multiple admissions the history of [OI] was missed completely. During other admissions the patient's back pain and related symptoms were minimalized in the documentation. . . . The lack of properly assessing Ms. Abshire's medical history and physical conditions is a breach in the standard of care.

Nurse Aguirre's report provides significantly more detail, but it summarizes the standard of care as follows:

1. The standard of care is to document a complete and accurate assessment including:

   a. A health history consisting of longstanding medical issues;

   b. Focused assessments based on the patient's primary complaint;

   c. Pain assessments consisting of intensity of the pain, location of the pain, interventions implemented to alleviate the pain and follow re-assessment to evaluate the effectiveness of the intervention(s);

   d. Assessments with any change in level of care or transfer of care between different departments; and

   e. Providing information in a timely manner.[11]

According to these two reports, the standard of care here required a full and accurate documentation of Abshire's medical history and symptoms when the nurses assessed her. The reports note that this was not done during each visit. We do not find these statements conclusory, as Christus contends. Rather, the reports identify specific action that should have been taken, but was not. *See id.* Although the reports do not designate a specific documentary procedure that should have been used, such detail "is simply not required at this stage of the proceedings." *Baty*, 543 S.W.3d at 697. As such, we hold the reports are sufficient as to the standard of care.

---

[11] While Nurse Aguirre's report identifies other standards of care relevant to this case, we address only the duty to document and assess because that is the only standard that Dr. Rushing causally linked to Abshire's injury.

12

Because the reports sufficiently identify the applicable standard of care and link the Christus nurses' alleged breaches with Abshire's injuries, we hold that the trial court did not abuse its discretion in denying Christus's motion to dismiss. Accordingly, we grant Abshire's petition for review and, without hearing oral argument, TEX. R. APP. P. 59.1, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

**OPINION DELIVERED:** November 16, 2018