

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-21-00012-CV

Pradyumna **MUMMADY**, M.D.,
Appellant

v.

Zulema **CABRERA**, Individually and on Behalf of the Estate of David Cabrera, Deceased,
Appellees

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2020CVB-000897D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by: Lori I. Valenzuela, Justice

Sitting: Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: August 25, 2021

AFFIRMED

Pradyumna Mummady, M.D. appeals an order denying his motion to dismiss appellees'

health care liability claims for failing to serve a sufficient expert report. Mummady's sole issue is

that appellees' expert and supplemental expert reports were deficient as to causation. Because the

trial court did not abuse its discretion by concluding the reports constituted a good faith effort to

show causation, we affirm the trial court's order.

## BACKGROUND

On May 4, 2019, David Cabrera went to the doctor's office with a sore throat, drainage, headaches, and other symptoms. On May 31, 2019, David's doctor, Dr. Sloman-Moll, admitted him to the Laredo Medical Center for a tonsillectomy and adenoidectomy (T&A) and pharyngeal plexus block. Sloman-Moll performed the procedures that same day. During the procedures, David experienced uncontrolled bleeding from his lingual artery. Sloman-Moll packed the artery to stop the bleeding.

David was then transferred to the ICU for monitoring by Mummady. On June 3, 2019, David's packing was removed without any bleeding. The following day, David's blood levels were critical, and he had blood coming out of his mouth when he coughed. Mummady ordered David extubated that day and moved him out of the ICU to a nursing floor. Mummady discharged David from the ICU without checking his blood levels or whether he was bleeding. On June 5, 2019, David was discharged from the hospital. Ten days later, on June 15, 2019, David started hemorrhaging from his nose and mouth. EMS was called to his residence, but despite receiving CPR en route to the hospital, David was dead on arrival. His autopsy noted an arterial cut and concluded that David died from severe blood loss.

David's wife, Zulema Cabrera, filed a wrongful death and survival action against Mummady, Sloman-Moll, Sloman-Moll's practice, and the hospital. Zulema served an expert report on the defendants, and Mummady objected to the sufficiency of the report. Zulema then served a supplemental expert report to address the objections, and Mummady objected to the sufficiency of the supplemental report. Mummady filed a motion to dismiss Zulema's claims because the reports were deficient as to causation. After the trial court denied the motion, Mummady timely appealed.

## STANDARD OF REVIEW

"We review a trial court's ruling on a motion to dismiss a health care liability lawsuit brought under Chapter 74 of the Texas Civil Practice and Remedies Code . . . for an abuse of discretion." *Thilo Burzlaff, M.D., P.A. v. Weber*, 582 S.W.3d 314, 320 (Tex. App.—San Antonio 2018, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Id.* "In reviewing the trial court's decision, we may not substitute our judgment for that of the trial court regarding factual matters." *Id.*

## CHAPTER 74'S EXPERT REPORT REQUIREMENTS

"Chapter 74 . . . requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(a)).[1] "[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id.* "In accordance with that purpose, [Chapter 74] provides a mechanism for dismissal of the claimant's suit in the event of an untimely or deficient report." *Id.*

Mummady does not argue that Zulema's expert reports are untimely, only that they are deficient. "An expert report is sufficient under [Chapter 74] if it 'provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between the failure and the injury.'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6)). "Importantly, the trial court need only find that the report constitutes a 'good faith effort' to comply with the statutory requirements." *Id.* "[A]n expert report demonstrates a 'good faith effort' when it '(1) inform[s] the defendant of the

---

[1] The parties do not dispute that Chapter 74 applies to Zulema's claims against Mummady.

specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Id.* (citation omitted). An expert report need not marshal all the claimant's proof, but the report must do more than merely state the expert's conclusions as to the standard of care, breach, and causation. *Id.*

The only aspect of the reports that Mummady challenges is the causation element.[2] The causation element requires an expert to explain "'how and why' the alleged negligence caused the injury in question." *Id.* at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). "A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Id.* "In satisfying this 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Id.* (citation omitted).

Causation, or more specifically proximate cause, has two components: (1) foreseeability and (2) cause-in-fact. *Thilo Burzlaff, M.D., P.A.*, 582 S.W.3d at 325. "The report need not use any particular 'magical words' such as 'proximate cause,' 'foreseeability,' or 'cause in fact.'" *Id.* Conversely, merely incanting magic words is insufficient, as is merely providing some insight to the claims. *Id.*

A healthcare provider's breach was a foreseeable cause of the plaintiff's injury if a healthcare provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *See Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)). Cause-in-fact requires that the act or omission be "a substantial factor in bringing

---

[2] In the trial court, Mummady admitted the report was sufficient to show standard of care and breach.

about the harm, and absent the act or omission—i.e., but for the act or omission—the harm would not have occurred." *Thilo Burzlaff, M.D., P.A.*, 582 S.W.3d at 325 (citation omitted).

## THE EXPERT REPORTS

Zulema served on Mummady an expert report and a supplemental expert report prepared by Dr. Glenn Rothman. Because Rothman's qualifications are unchallenged, we proceed to identifying the substance of his reports. In the expert report, Rothman explained Mummady was David's critical care pulmonologist in the ICU after David suffered a post-tonsillectomy hemorrhage. Rothman stated that his focus was on David's lab results showing "Hematocrit/Hemoglobin [or H&H] values, vital signs including blood pressure, heart rate and respiration rate and changes in hemodynamics reflecting instability," and whether they indicated "blood loss anemia."

Rothman further stated, "While in the ICU, [David] was under the care of critical care physician/pulmonologist [Mummady] who wrote a daily note and whose plan was to eventually wean [David] from the ventilator." After noting David's H&H levels were low, Rothman explained:

> Nursing notified Dr. Sloman-Moll of the critical hemoglobin and that [David] had blood coming out of his mouth when he coughed. There are no physician comments by either Dr. Sloman-Moll or Dr. Mummady concerning the patient's low/critical hematocrit and hemoglobin values. Intake and output records reflect no blood loss documentation. Dr. Mummady wrote an order to extubate [David] on June 4, 2019 and [David] was moved from the ICU to a nursing floor, alert and oriented, [later] that evening.

It was noted that David "was tender and inflamed in the throat area with swallowing difficulties post tonsillectomy and post extubation." The report further stated that ten days after being discharged, "EMS was called to [David's] home [where he was found hemorrhaging] from the airway (mouth and nose). CPR was initiated and continued throughout transport to Doctors Hospital of Laredo. . . . [David was] dead on arrival."

Rothman's report then stated that, as determined by an autopsy, the cause of death was exsanguination (severe blood loss):

> An Autopsy was performed the following morning which documents that [David] died from exsanguination following tonsillectomy. The report includes examination of the oropharynx, which revealed a large amount of clotted blood. The stomach contained 500 ml of liquid and clotted blood. The small intestine was remarkable for a large amount of blood and there was a 150 mis. of blood aspiration in the lungs.

Rothman noted David's labs after his tonsillectomy showed a "critical downward trend" that Mummady did not "act[] upon to get the injury repaired, stop the bleeding and treat the blood loss with transfusion." According to the report, "Dr. Mummady had access to [David's] medical chart and was still in charge of [David's] care when he ordered [David] to be extubated and moved to the floor—without ordering a CBC before discharging him from the ICU." Mummady also did not perform an examination or "determine whether there was active bleeding, oozing or clots in the oral pharynx before discharge" and did not order "a blood transfusion to correct the critical Hgb level."

Rothman explained that Mummady had breached the standard of care by "discharging a patient whose artery had not been repaired resulting in profound blood loss anemia and serious risk of continued bleeding." Rothman's report stated that "[t]o a reasonable probability, [David's] debilitated state at discharge from the hospital, with an unrepaired arterial injury and profound blood loss anemia made it unlikely for him to survive the hemorrhaging which occurred on June 15, 2019 [the day he died]." Furthermore, the report stated that had the source of the bleed been addressed before David was discharged, he "would not [have] bled to death on June 15, 2019. The Emergency Room physician documented that his cardiorespiratory arrest was due to intense bleeding post tonsillectomy."

In a supplemental report responding to Mummady's initial objections, Rothman addressed foreseeability more specifically:

> Let me address the foreseeability and the cause of death supported by the objective evidence. . . . Dr. Mummady, was the designated pulmonary consultant to whom the care was transferred after the tonsillectomy. Dr. Mummady knew that there had been an arterial injury encountered during Dr. Sloman-Moll's surgery resulting in bleeding uncontrolled by cauterization and suturing. It was his responsibility to determine whether packing had controlled the bleed. Medically, this would be determined by, not only observing blood, but also by the serial CBCs measuring H&H.

Rothman detailed additional facts:

> But for . . . Dr. Mummady's failure to monitor and recognize the dropping H & H, transfuse over the course of the five day hospitalization and urge arterial repair, it is more likely than not, that the severity of the June 15, 2019 bleeding episode would not have occurred. There is a possibility that some additional bleeding might occur, but in the context of an unrepaired arterial injury, more likely than not, the arterial injury caused and/or contributed to the severe bleeding on June 15, 2019. Additionally, since [David's] hemoglobin level had trended downward toward a critical level with no intervening measures by Dr. Sloman-Moll or Dr. Mummady to stop this trend, the additional blood loss created strain on his heart and he suffered cardiovascular arrest on this date.
>
> . . . .
>
> It is my opinion an episodic bleed in the 10 days after hospital discharge occurred. There is no reason to believe that [David's] bleeding from an arterial injury that hadn't been repaired, would completely stop after hospital discharge. He was certainly at high risk to bleed over the next days after discharge, just as he had over the 4 days in the ICU. His blood loss without a transfusion, made him less likely to survive an episodic bleed that occurred on June 15, 2019. If transarterial embolization by interventional radiology or external ligation at any time before discharge would have occurred, this young, healthy man, in probability, (greater than 50%) would have made a full recovery.
>
> . . . . Dr. Mummady deemed the trend [in blood levels] 'okay' with no artery repair intervention or transfusion, discharged him to the floor and sent him home the night of June 5, 2019.
>
> Had Dr. Mummady been vigilant of the dropping H&H, transfused and urged arterial repair before discharge, [David] would have been hemodynamically equipped to survive bleeding if it did reoccur at home.

Rothman concluded by stating that, given the above circumstances, Mummady's breach of the applicable standard of care caused David's death.

## DISCUSSION

As detailed above, Rothman's report extensively lays out the facts connecting Mummady's breach of the standard of care to David's death. Rothman's supplemental report directly addresses the foreseeability element of causation and states Mummady was aware David had a post-surgery injury causing severe bleeding that had not been stopped by cauterization or suturing. Mummady does not argue or explain how death is an unforeseeable consequence of severe and extreme bleeding or blood loss.

As to cause-in-fact, according to Rothman's report, the cause of David's death was exsanguination, or severe blood loss. Thus, without severe blood loss, David would not have died. We therefore consider the facts in Rothman's expert and supplemental reports relating to whether Mummady's acts and omissions would have stopped David's severe blood loss. The reports go beyond merely asserting that had Mummady not discharged David from the ICU, David would have lived. The reports go on to state David's severe blood loss was caused by an unrepaired arterial injury. The reports also state it was Mummady's responsibility to determine whether David's bleeding was controlled before discharging him.

The reports then detail a series of acts and omissions by Mummady that led to David being discharged while at risk of exsanguination:

- David's labs showed that his blood levels were in a critical downward trend and Mummady did nothing to repair the injury, stop the bleeding, or treat the blood loss with a transfusion.

- Mummady ordered David to be extubated and moved to the nursing floor and did not consider David's blood levels before discharging him from the ICU.

- Mummady did not perform an examination or "determine whether there was active bleeding, oozing or clots in the oral pharynx before discharge" and did not order "a blood transfusion to correct the critical Hgb level."

- Mummady discharged David from the ICU with an unrepaired artery that caused the severe blood loss anemia.

- The blood loss led to the hemorrhaging that occurred on June 15, 2019, and more likely than not, David would not have experienced a severe bleeding episode that led to his death on June 15, 2019.

- David's discharge with an unrepaired arterial injury and blood loss anemia made him unlikely to survive the hemorrhaging which occurred on June 15, 2019.

- Had Mummady addressed the source of the bleed before David was discharged, David would not have bled to death on June 15, 2019.

In serving the expert and supplemental reports, Zulema was not required to marshal all the evidence as to causation or prove the entire case. *See Abshire*, 563 S.W.3d at 223–24. Her burden was merely to serve a report explaining "how and why" Mummady's negligence caused David's death, in a good faith effort to show causation was "going to be proven," in compliance with applicable statutory requirements. *See id.* at 224.

Mummady relies on several cases explaining why various expert reports were deficient as to causation. The courts' analyses in these cases are highly fact dependent, and we conclude the cited cases are distinguishable. *See, e.g.*, *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (per curiam) (noting sole statement regarding causation was conclusory, and "the report simply opines that Barbara might have had 'the possibility of a better outcome' without explaining how Bowie's conduct caused injury to Barbara"); *Fulp v. Miller*, 286 S.W.3d 501, 508 (Tex. App.—Corpus Christi 2009, no pet.) (stating expert "failed to link his conclusions to the facts"); *Lockhart v. Guyden*, No. 01-08-00983-CV, 2009 WL 2050983, at *3 (Tex. App.—Houston [1st Dist.] July 16, 2009, no pet.) (mem. op.) (stating "there is no discussion of . . . what the course of treatment at an acute-care facility would have been during that 11-hour time frame"); *Gray v.*

*CHCA Bayshore L.P.*, 189 S.W.3d 855, 860 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (rejecting expert report for including only a conclusory statement and "not fleshing out how appellees' failure to monitor Gray's extremities caused her injury"). In his reports, Rothman provided more than mere conclusory statements; he linked the facts to his conclusion regarding causation, identified David's specific injuries, discussed the courses of action that would have been appropriate, and fleshed out how Mummady's failure to monitor David's blood levels and check to see if David was still bleeding, and to not stop the bleeding, resulted in David's discharge with a risk of extreme blood loss that ultimately occurred and led to his death. The report sufficiently links Rothman's conclusions to the facts, it gives Mummady fair notice of the plaintiff's complaints against him, and is sufficient to have permitted the trial court to conclude there is merit to one or more of the claims. *See Jelinek*, 328 S.W.3d at 539.

Mummady disagrees with Rothman's explanation of the causal chain, and parses out individual statements to show—in isolation—how the individual statements are insufficient. But we must consider the "four corners" of the reports and view the reports as a whole. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). When all statements in the reports are viewed together, Rothman's explanation of the causal chain is relatively straightforward, is not conclusory, and does not require speculation. Considering Rothman's detailed explanation of causation, we cannot say the trial court acted arbitrarily, unreasonably, or without reference to guiding rules and principles in concluding that the reports were a good faith effort to show how and why Mummady's negligence caused David's death.

## CONCLUSION

The trial court did not abuse its discretion by denying Mummady's motion to dismiss. We therefore overrule Mummady's sole issue on appeal and affirm the trial court's order denying Mummady's motion to dismiss.

Lori I. Valenzuela, Justice