**AFFIRMED and Opinion Filed February 17, 2022**



**In the**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00050-CV**

**MATTHEW MCKERLEY, D.O., Appellant**
**V.**
**DANISHA JACKSON AND DEVIN JACKSON, INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF MERLENIA JACKSON, Appellees**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-10884**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Carlyle
Opinion by Justice Carlyle

Matthew McKerley, D.O., appeals the trial court's denial of his motion to dismiss under chapter 74 of the Texas Civil Practice and Remedies Code. We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

On August 1, 2017, Merlenia Jackson presented to the emergency room at Medical City Dallas with dyspnea, hypertension, and swelling in her legs. Dr. McKerley, an emergency physician at the hospital, examined Ms. Jackson and discharged her later that day. She died the following day from a pulmonary embolism.

Merlenia's children, appellees Danisha Jackson and Devin Jackson, sued the hospital and Dr. McKerley, alleging they were grossly negligent for failing to diagnose and treat Merlenia's pulmonary embolism. As required by Chapter 74 of the civil practice and remedies code, the Jacksons also served the defendants with an expert report from Elizabeth Jones, M.D.

Dr. Jones is board certified in both internal and emergency medicine, is an associate professor of emergency medicine, and has practiced emergency medicine for more than twenty years. She explained in her report that dyspnea, or shortness of breath, is a serious symptom that can indicate a variety of life-threatening conditions, including "heart attack, pulmonary embolism (PE), pulmonary edema, empyema, pleural effusion, pericardial tamponade, pneumonia, pneumothorax, asthma or emphysema and acidosis." According to Dr. Jones, when a patient presents with a symptom like dyspnea, the standard of care requires that the provider "perform a complete history and physical, develop a differential diagnosis of the condition," "consider all potentially dangerous causes," and either "establish a diagnosis to a reasonable degree of medical certainty or admit the patient for further testing."

Dr. Jones explained that diagnosing a pulmonary embolism can be difficult "because it is not detected by physical exam or chest x-ray." Nevertheless, "[b]ecause an untreated pulmonary embolism has a mortality of up to 30%, the diagnosis must be considered in all cases of dyspnea," and "[i]t should especially be

considered when the dyspnea is not explained by another diagnosis." Thus, "all patients with unexplained dyspnea must be fully evaluated" for a pulmonary embolism. Such an "evaluation may include a more complete history, bedside ultrasound, clinical decision scores such as PERC or Well's, the D-dimer blood test and/or CT of the chest." But according to Dr. Jones, "[n]one of this was done" for Merlenia.

Dr. Jones stated that Merlenia's caregivers "did not perform a complete history and physical, did not establish a complete differential diagnosis, did not fully evaluate the potentially dangerous causes of the patient's condition and did not establish a diagnosis." And without a diagnosis, "the providers could not predict her clinical course," which made her discharge premature. "All of these actions violate the standard of care."

Dr. Jones further explained that a chest CT scan is the "gold standard" for diagnosing a pulmonary embolism, but the procedure is expensive and exposes the patient to radiation. Thus, a physician should not invariably order a CT scan whenever a patient presents with dyspnea; rather, the physician must first determine whether the dyspnea can be explained by other conditions revealed by a physical examination, x-ray, and lab work. If the dyspnea is otherwise explained, it is much less likely the patient has a pulmonary embolism. But without an alternative explanation, the physician must fully evaluate whether the patient has a pulmonary

embolism before discharging her. If the patient has a low probability of pulmonary embolism, the physician can rule out the condition using clinical decision tools or a blood test. If there is a high probability, a CT scan is required.

According to Dr. Jones, although Merlenia was at low risk for a pulmonary embolism, the condition "could not be ruled out using the PERC clinical decision rule due to her age." And because no other explanation for the dyspnea was found after an x-ray, physical exam, and lab work, a pulmonary embolism became more likely. Thus, her treating physician should have used a "D-dimer" blood test to rule out the condition and, if the D-dimer came back positive, a CT scan to make a definitive diagnosis. "By failing to properly evaluate Ms. Jackson using the standard evaluation tool (the complete history and physical) used by all physiicians [sic] to assess patinets [sic], the treating physician did not treat the patient with the usual, prudent care and skill . . . owed to every patient." Moreover, "[b]y failing to consider all of the potentially fatal causes of dyspnea, the treating physician did not exercise reasonable clinical judgment."

With respect to causation, Dr. Jones explained that an untreated pulmonary embolism has a mortality rate of thirty percent, while a treated pulmonary embolism's mortality rate is between two and ten percent, with "recent studies finding mortality between 1.8-3.3%." Dr. Jones thus opined that the treating physician's "disregard for the standard evaluation of shortness of breath," which

resulted in failing to diagnose the pulmonary embolism, "lead [sic] to Ms. Jackson's death to a reasonable degree of medical certainty."

Dr. McKerley and the hospital moved to dismiss the Jacksons's claims, arguing that Dr. Jones's report did not satisfy Chapter 74's requirements. After a hearing and additional motion practice, the Jacksons voluntarily dismissed their claims against the hospital, and the trial court entered an order denying Dr. McKerley's motion to dismiss but requiring the Jacksons to amend their expert report "to include information pertaining to causation of damages, treatment options, and efficacy of treatments in regards to the deceased Merlinia [sic] Jackson."

Following that order, the Jacksons filed and served a one-page document titled "Plaintiff's Expert Report Addendum." The addendum provided general information about the causes of pulmonary embolisms. It also explained—with a quote from "Uptodate.com"—that, although the prognosis for a patient with a pulmonary embolism is variable, "in general, if left untreated, PE is associated with an overall mortality of up to 30 percent compared with 2 to 11 percent in those treated with anticoagulation."

With respect to treatment options, the addendum noted that it depends on the patient's stability. Unstable patients either receive a drug that dissolves the clot or undergo a procedure to remove it. Stable patients, in contrast, receive "systemic anti-coagulation," which does not remove the clot but prevents it from growing while the

body eventually absorbs it. This treatment involves either "intravenous or subcutaneous heparin, subcutaneous low-molecular weight heparin, oral warfarin or oral novel anti-coagulants." The choice of anti-coagulant is "individualized based on factors such as kidney function, acuity of illness, risk of bleeding and cost." Treatment generally continues for at least 3 months, although some patients require life-long treatment based on their continuing risk factors.

The addendum concludes by stating: "**In this case,** the failure of the treating physician to diagnose pulmonary embolism denied the patient the significant mortality reduction provided by systemic anti-coagulation."

After the Jacksons filed their addendum, Dr. McKerley amended his motion to dismiss, contending the addendum did not address the initial report's deficiencies with respect to causation. The trial court held a hearing, after which it denied the motion, and Dr. McKerley timely appealed.

We review the trial court's decision to deny a motion to dismiss challenging the adequacy of a Chapter 74 expert report for abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). Under Chapter 74, claimants in health care liability cases must serve an expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351. The purpose of this "requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223. The report must fairly

summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. § 74.351(r)(6).

A report is adequate under the statute if it contains sufficient information to inform the defendant of the specific conduct at issue and provide a basis for the trial court to conclude the claims have merit. *Abshire*, 563 S.W.3d at 223. It "need not marshal all of the claimant's proof," nor must it meet the same standards as the evidence offered at summary judgment or trial. *Methodist Hosps. of Dallas* v. *Nieto*, No. 05-18-01073-CV, 2019 WL 6044550, at *7 (Tex. App.—Dallas Nov. 15, 2019, no pet. h.) (mem. op.). But it must offer more than an expert's conclusory statements about the standard of care, breach, and damages. *Abshire*, 563 S.W.3d at 223. Thus, "the expert must explain the basis of his statements to link his or her conclusions to the facts." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

A trial court may grant a motion to dismiss based on the inadequacy of an expert report only "if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statute. TEX. CIV. PRAC. & REM. CODE § 74.351(l). When reviewing a report's adequacy, we consider only the information contained within the four corners of the report. *Abshire*, 563 S.W.3d

at 223. And although we "may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended," "we do not abandon common sense" when reviewing these reports. *Id.*

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY CONSIDERING THE ADDENDUM

Dr. McKerley first contends the trial court abused its discretion to the extent it considered the addendum, arguing that, because the addendum does not identify Dr. Jones as its author, it does not qualify as an expert report under Chapter 74. For support, Dr. McKerley points to cases holding that expert reports were deficient for failing to identify and establish the qualifications of opining physicians. *See, e.g.*, *Mimari v. Johnson*, No. 04-06-00454-CV, 2006 WL 3206068, at * 2 (Tex. App.—San Antonio Nov. 8, 2006, no pet.); *Schorp v. Baptist Mem'l Health Sys.*, 5 S.W.3d 727, 730–32 (Tex. App.—San Antonio 1999, no pet.). Those cases are inapposite, however, because they did not involve an addendum to a previously served report in which the opining physician is identified. The relevant inquiry here is not whether the addendum itself qualifies as an expert report; it is whether the addendum, when considered in combination with Dr. Jones's initial report, satisfies the statute's requirements.

To the extent Dr. McKerley complains that Dr. Jones did not sign the addendum, nothing in the statute requires a signature on an expert report, much less on an addendum to a report that was signed by the physician. *See Carreras v.*

*Marroquin*, No. 13-05-082-CV, 2005 WL 2461744, at * 1 (Tex. App.—Corpus Christi–Edinburg Oct. 6, 2005, pet. denied) (mem. op.) ("[W]e reject Carreras's contention that the statute requires an expert report to bear the expert's signature. Nothing in the statute provides for such a requirement."). The Jacksons served a single report from a single expert. They then served a document, in response to a court order requiring an amendment to their expert report, identifying itself as the plaintiffs' "Expert Report Addendum." There is no ambiguity as to whose opinions are supplemented by the addendum. And absent a genuine dispute about the addendum's authenticity,[1] the trial court did not abuse its discretion by considering it.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION TO DISMISS

Dr. McKerley next contends Dr. Jones's opinions are conclusory and thus do not constitute a good faith effort to comply with the statute as to breach or causation. To constitute a good faith effort, the report need only inform Dr. McKerley of the specific conduct at issue and provide a basis for the trial court to conclude the plaintiffs' claims are not meritless. *Abshire*, 563 S.W.3d at 223. Dr. Jones's report clears this low bar. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht,

---

[1] We note that Dr. McKerley did not challenge the addendum's authenticity in advance of the hearing on his amended motion to dismiss. Had he done so, the Jacksons might have been able to present evidence establishing that Dr. Jones provided the opinions in the addendum.

J., concurring in part and dissenting in part) ("An expert report, as we have interpreted it, is a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous.").

Dr. Jones specifies the conduct at issue—Dr. McKerley's alleged failure to follow the standard protocol for evaluating patients with dyspnea to rule out potentially fatal conditions like pulmonary embolism. Dr. Jones explains that the standard of care requires emergency physicians like Dr. McKerley to rule out a pulmonary embolism whenever a patient like Merlenia presents with dyspnea that cannot be attributed to another source after an exam, x-ray, and blood work. Dr. Jones explained that Merlenia's treating physician should have performed a "D-dimer" blood test to rule out a pulmonary embolism, with a chest CT scan used to confirm any positive result. Yet, according to Dr. Jones, Dr. McKerley did not fully evaluate whether Merlenia had a pulmonary embolism, and he discharged her without discovering the root cause of her dyspnea, both of which breached the standard of care.

With respect to causation, Dr. Jones explained that the treating physician's failure to follow standard protocol for evaluating patients with dyspnea resulted in Merlenia being discharged without receiving treatment for her pulmonary embolism. Dr. Jones stated that, according to recent studies, the mortality rate for patients treated for pulmonary embolisms is lower than four percent, while the mortality rate

for patients with untreated pulmonary embolisms is thirty percent. By failing to diagnose Merlenia's pulmonary embolism, Dr. Jones opined, the treating physician deprived her of the "significant mortality reduction provided by systemic anti-coagulation." Thus, she opined, the treating physician's breach of the standard of care led to Merlenia's "death to a reasonable degree of medical certainty."

In our view, Dr. Jones's report provides a straightforward link between Dr. McKerley's alleged breach of the standard of care—failing to follow established protocol for treating patients with dyspnea—and Merlenia's death from an undiagnosed pulmonary embolism. *See Abshire*, 563 S.W.3d at 223. We affirm the trial court's order denying Dr. McKerley's motion to dismiss.

210050f.p05

/Cory L. Carlyle/  
CORY L. CARLYLE  
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MATTHEW MCKERLEY, D.O.,
Appellant

No. 05-21-00050-CV     V.

DANISHA JACKSON AND DEVIN
JACKSON, INDIVIDUALLY AND
AS REPRESENTATIVES OF THE
ESTATE OF MERLENIA
JACKSON, Appellee

On Appeal from the 68th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-19-10884.
Opinion delivered by Justice Carlyle.
Justices Myers and Partida-Kipness
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Danisha Jackson and Devin Jackson, individually and as representatives of the Estate of Merlenia Jackson recover their costs of this appeal from appellant Matthew McKerley, D.O.

Judgment entered this 17th day of February, 2022.

–12–