# Supreme Court of Texas

No. 22-0317

Jesse Uriegas, as Guardian of Brandon Uriegas,
an Incapacitated Person,

*Petitioner*,

v.

Kenmar Residential HCS Services, Inc.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

**PER CURIAM**

A care facility resident fell twice and sustained serious injuries. His guardian sued the facility for negligence and provided two expert reports to support the claims. The trial court ruled that the reports provide a fair summary of the experts' opinions regarding the standard of care, breach, and the cause of injury, as the Texas Medical Liability Act requires. *See* Tex. Civ. Prac. & Rem. Code § 74.351(a), (*l*), (r)(6). The court of appeals reversed, concluding that the reports lack sufficient detail about the appropriate standard of care and breach. We conclude that the reports sufficiently set forth a standard of care and breach

linked to the underlying alleged facts, and therefore we reverse the court of appeals' judgment.

## I

Brandon Uriegas, a nonverbal adult, lives with severe intellectual disabilities, deformity of both feet, scoliosis, autism, and osteoporosis. In 2006, he moved into a residential care facility for people with developmental disabilities. Respondent Kenmar Residential HCS Services managed the facility.

In September 2018, Uriegas fell and hit his head while showering. The parties dispute whether a Kenmar staff member attended Uriegas at the time he fell. At the emergency room, Uriegas received three staples to treat lacerations to his scalp. Later that evening, Kenmar staff reported that Uriegas appeared "wobbly."

The following day, Uriegas fell a second time while using the toilet, allegedly without staff assistance. Kenmar staff allegedly did not arrange for a medical evaluation.

On the morning of September 24—one day after the second fall and two days after the first—Kenmar staff reported that Uriegas could not stand and that his foot was swollen. Uriegas was taken to the hospital and admitted that afternoon with a fractured left hip and femur. He required surgery and was hospitalized for twenty-one days.

Jesse Uriegas, Uriegas's father and legal guardian, sued Kenmar for negligence, gross negligence, and negligent hiring and supervision of its employees. He alleged that Kenmar, among other things, "fail[ed] to provide adequate supervision for [Uriegas] during daily activities,

2

including the use of bathroom facilities," "fail[ed] to provide reasonable and adequate care," and "fail[ed] to timely seek medical treatment."

Jesse Uriegas served Kenmar with an expert report by Maureen Hildebrandt, a certified rehabilitation registered nurse. Nurse Hildebrandt's report states that the appropriate standard of care requires that "all injuries, regardless of severity, . . . be assessed and documented" because Uriegas was "incapable of verbalizing his needs" and "could not be relied upon to report injury-related pain/discomfort." Uriegas also "was incapable of independently performing all aspects of personal care in the bathroom," and thus "a staff member would need to be present while [Uriegas] was taking a bath/shower." The report indicates that after the first fall, the standard of care required "close monitoring at all times, especially when [Uriegas] was walking anywhere." Nurse Hildebrandt's report identifies Kenmar's breach as "failing to [e]nsure that [Uriegas]'s [individual care plan] accurately reflected the specific care necessary based on [Uriegas]'s specific needs" and "failing to properly implement the necessary interventions in [Uriegas]'s plan of care both before and after [the date of injury]."

Kenmar objected to Nurse Hildebrandt's report on several grounds. The trial court sustained Kenmar's objection to Nurse Hildebrandt's qualifications to opine on causation; it overruled Kenmar's other objections and permitted supplementation with an expert report by Dr. Brett Cascio, an orthopedic surgeon. In his report, Dr. Cascio opined that the standard of care included "significant monitoring and assistance when moving" to prevent falls, "frequent and thorough evaluations for injury," and, after a fall, "a complete and

3

thorough medical evaluation . . . to ensure that [Uriegas] did not sustain a serious injury that he is unable to relay to caretakers." Dr. Cascio identified Kenmar's breach: "there was not any staff to assist [Uriegas] getting in and out from the bathroom"; "Kenmar failed to provide assistive care personnel and equipment"; "[a]fter the falls, Kenmar did not properly assess [Uriegas] for injuries"; and "Kenmar and employees failed to provide the appropriate monitoring and assistance."

Kenmar objected to this report as well. The trial court overruled Kenmar's objections and denied its motion to dismiss. Kenmar appealed.

The court of appeals reversed, holding that the reports failed to provide a fair summary of the standard of care and the alleged breach of that standard. ___ S.W.3d ___, 2022 WL 843890, at *1 (Tex. App.—Amarillo Mar. 11, 2022). One justice would have held that Dr. Cascio's report provided a fair summary. *Id.* at *6 (Quinn, C.J., concurring and dissenting).

## II

The Texas Medical Liability Act requires healthcare liability claimants to timely serve a defendant healthcare provider with an adequate expert report. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (*l*). An expert report is adequate if it "represent[s] an objective good faith effort" to provide a "fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(*l*), (r)(6). An expert report demonstrates

4

a good faith effort and thus satisfies the statute's requirements when it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty v. Futrell*, 543 S.W.3d 689, 693-94 (Tex. 2018). In articulating the standard of care and breach, an expert report "must set forth 'specific information about what the defendant should have done differently'"; that is, "'what care was expected, but not given.'" *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018) (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)).

The Act permits a claimant to satisfy the requirement with multiple reports "by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider." TEX. CIV. PRAC. & REM. CODE § 74.351(i). Thus, we review the adequacy of reports in the aggregate. *See Abshire*, 563 S.W.3d at 223 ("[O]ne expert need not address the standard of care, breach, and causation; multiple expert reports may be read together to determine whether these requirements have been met.").

In this case, the trial court properly sustained Kenmar's objection to Nurse Hildebrandt's report because she was not qualified to opine on causation. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(C) (requiring that a qualified physician opine on causation). The trial court granted an extension to file Dr. Cascio's report and, after receiving the second report, viewed both reports together and permitted the suit to proceed. In denying Kenmar's motion to dismiss, the trial court necessarily found

5

that the two reports together provide a fair summary of the alleged standard of care, breach, and causation, as the Act requires.

In Nurse Hildebrandt's report, she opines that the standard of care required "a staff member . . . to be present while [Uriegas] was taking a bath/shower" because Uriegas "was incapable of independently performing all aspects of personal care in the bathroom." His diagnoses of osteoporosis and bilateral pedal deformity "increas[ed] the risk of falls" and "placed [him] at a higher risk for injury in the event of a fall."

Leaving aside Uriegas's general increased risk of falling, Nurse Hildebrandt further explains that a fall placed Uriegas at an increased risk of an undetected injury because he was "incapable of verbalizing his needs" and "could not be relied upon to report injury-related pain/discomfort." Given his limited ability to self-report injury, the standard of care in Uriegas's case required that "all injuries, regardless of severity, . . . be assessed and documented." After the first fall, the report indicates that it was "clearly and undeniably the responsibility of the nursing staff" to modify Uriegas's care to include "close monitoring at all times, especially when [Uriegas] was walking anywhere."

In further support of the alleged standard of care, Dr. Cascio explains in his report that the care plan for someone with Uriegas's diagnoses should include "significant monitoring and assistance when moving" to prevent falls, "frequent and thorough evaluations for injury," and, after a fall, "a complete and thorough medical evaluation . . . to ensure that [Uriegas] did not sustain a serious injury that he is unable to relay to caretakers."

6

Dr. Cascio opines that "the proper standard of care [was] to fully examine [Uriegas] for injury and evaluate the existing care plan to determine if a change or correction is needed." Kenmar "should have conducted a thorough evaluation for injury considering that [Uriegas] is essentially nonverbal and cannot convey injuries himself."

Kenmar contends that the reports do not provide a fair summary of the standard of care. In its view, Nurse Hildebrandt's report is impermissibly vague. For example, the report recommends updating the care plan after a "change in status" but does not define what a "change in status" means; she suggests that "immediate interventions" were required after Uriegas's fall but fails to describe those interventions; and she prescribes training for staff without explaining what instruction should have been given to train them in "how to properly monitor and care for the client." Kenmar further contends that Dr. Cascio should have addressed the number of people Kenmar should have placed in the position of monitoring Uriegas, their schedule, and the type of assistance they should have provided. Agreeing with Kenmar, the court of appeals concluded that Nurse Hildebrandt provided "conclusory statements that fail[ed] to inform Kenmar of what it should have done differently." 2022 WL 843890, at *4. The court of appeals similarly rejected Dr. Cascio's report because it "provide[d] no details regarding what constitutes 'appropriate' or 'significant' monitoring and assistance," did not "explain who was responsible for administering an examination or what an examination should have encompassed," and did not "explain what specific action Kenmar should have taken but did not." *Id.* at *5.

7

While the two reports may lack sufficient specificity with respect to initial monitoring and fall protection, when viewed together, they sufficiently describe the standard of care for someone with Uriegas's diagnoses as requiring a thorough evaluation for injuries after a fall and increased staff monitoring after a fall takes place to ensure that the patient does not attempt to use the toilet without assistance. According to the alleged underlying facts, Uriegas received no medical evaluation or treatment after his second, unmonitored fall until the next day. With respect to Kenmar's alleged lack of post-fall monitoring, evaluation for injury, and treatment, Dr. Cascio's report sufficiently sets forth the standard of care and breach. Dr. Cascio's report calls for monitoring Uriegas "when moving" after the first fall. While the reports lack specifics in some instances, they provide a fair summary of the standard of care for the claim of failure to appropriately monitor Uriegas after his two falls. Further, the reports are based on the underlying factual allegations that Kenmar failed to monitor according to an appropriate care plan after a fall. In Dr. Cascio's view, Kenmar failed to increase monitoring, evaluate Uriegas for injuries, or seek evaluation before and after his second fall, as he states the appropriate standard of care requires.

In *Miller v. JSC Lake Highlands Operations, LP*, a nursing home resident died after aspirating on her dental bridge. 536 S.W.3d 510, 512 (Tex. 2017). The expert reports explained that the nursing home staff knew her dental bridge was missing and that her voice sounded raspy; under those circumstances, the standard of care required staff to check the resident's throat for the missing bridge and take her to the

8

emergency room. *Id.* at 517. The staff's failure to do so contributed to the delay that ultimately, in the experts' opinion, caused her death. *Id.* In this case, as in *Miller*, the standard of care depends on the facility staff's alleged knowledge: that Kenmar staff knew that Uriegas was at increased risk of injury from falls due to his diagnoses and he could not verbalize his complaints. In *Miller*, the standard of care required looking in the patient's throat; according to the experts in this case, it required additional monitoring and evaluation of symptoms, like appearing "wobbly" after a fall.

Kenmar further challenges the reports as lacking specificity about breach of the standard of care. Kenmar observes that it brought Uriegas to the hospital after his first fall, which, it contends, disproves that it breached the standard of care. Without more, a health care provider's disagreement with the expert's opinion in a Chapter 74 report does not render the report insufficient. *See, e.g., Miller,* 536 S.W.3d at 516-17 ("At this preliminary stage, whether [the expert's articulated standards] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort."). Even so, Dr. Cascio faults Kenmar for failing to monitor Uriegas upon his return to the facility, which he notes resulted in delayed medical evaluation, and for its failure to properly treat Uriegas's injuries after the second fall. The first trip to the hospital does not address these alleged breaches. We conclude that Dr. Cascio's opinion as to breach provides a fair summary of the claims against Kenmar.

The court of appeals likened Dr. Cascio's report to one that improperly "infer[red] breach of a standard of care from the fact that an

9

injury exists that normally should not." 2022 WL 843890, at *6 (quoting *Hoelscher v. San Angelo Cmty. Med. Ctr.*, No. 03-03-00236-CV, 2004 WL 2731967, at *3 (Tex. App.—Austin Dec. 2, 2004, no pet.)). But the report notes that Uriegas required a thorough examination after a fall and additional monitoring because Uriegas's condition prevents him from communicating his personal needs and injuries to a caregiver. Dr. Cascio recites specific facts to support his opinions: Kenmar allegedly knew of Uriegas's diagnoses, knew that he was at risk for falling again without assistance, and knew that because Uriegas could not report injuries to staff, he required a thorough evaluation after a fall. In Dr. Cascio's opinion, Kenmar did not provide the required assistance and evaluation.

Finally, the court of appeals faulted Nurse Hildebrandt's report for "not explain[ing] how the outcome would have changed" had Kenmar complied with the alleged standard of care and for "not assert[ing] that the failure to have a nurse assess [Uriegas] after this fall was the proximate cause of his injuries." 2022 WL 843890, at *5. Dr. Cascio opines, however, that a proper assessment would have led to earlier medical intervention and treatment and the thirty-hour delay contributed to Uriegas's injuries. Only physicians are qualified to opine on causation, and Kenmar does not challenge Dr. Cascio's opinion as to causation. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(C).

* * *

10

We hold that the trial court did not abuse its discretion in denying Kenmar's motion to dismiss under Chapter 74. The proffered reports provide a fair summary of the experts' opinions as to the appropriate standard of care and breach of that standard. Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings. *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** September 15, 2023