# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00586-CV

**Almendra Fernandez, BS, IONM; T-Med, L.P. d/b/a Monitoring Concepts; and T-Med, L.P., Appellants**

**v.**

**Sylvia Gonzales, Appellee**

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-002575, THE HONORABLE JESSICA MANGRUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Almendra Fernandez and T-Med, L.P.[1] bring this interlocutory appeal of the trial court's order denying their challenge to the sufficiency of Sylvia Gonzales's expert reports in her suit alleging health care liability claims. *See* Tex. Civ. Prac. & Rem. Code §§ 51.014(a)(9), 74.351. In four appellate issues, Fernandez and T-Med say that the expert reports fall short of the requirements for articulating the applicable standard of care, Fernandez's and T-Med's alleged breaches, and causation. We affirm.

---

[1]  The live petition names T-Med as a defendant twice—once by itself and another time "doing business as Monitoring Concepts." No one before us disagrees that there is only one T-Med involved in this case.

## BACKGROUND

When Gonzales was 65 years old, she experienced pain in her neck, shoulders, and upper arms. She was diagnosed with degenerative disc disease with central disc herniation and opted to have surgery—a two-level cervical discectomy—to achieve some relief. A surgeon performed the surgery with Fernandez, an intraoperative neurophysiological monitoring (IONM) technician and alleged employee of T-Med, present for monitoring and another physician also monitoring but from a remote location. In this role during the surgery, Fernandez was to watch and interpret the data generated by devices monitoring Gonzales's nervous system.

During the surgery and after the incision, the surgeon placed a cage near two of Gonzales's cervical vertebrae. Some of the IONM data—wave forms generated by the monitoring devices—that Fernandez was to monitor then became abnormal, potentially signifying an injury.

After the surgery and while in recovery, Gonzales reported weakness in her right hand and right leg and soon lost the ability to move them. She has since undergone extensive physical, occupational, and speech therapy, but when discharged home, she needed a walker for help moving, which she had not needed before. She alleges that she has not been the same physically as she was before the surgery, "suffer[ing] and continu[ing] to suffer from significant right-sided weakness and pain, unsteady gait, . . . limited mobility requiring a walker for assistance, . . . [and] no useful function of her right" arm. She's been told by a physician that she "is permanently and severely disabled and not likely to experience any spontaneous recovery."

She sued the surgeon; the remote monitoring physician; Fernandez; Fernandez's alleged employer, T-Med; and others. She alleged negligence health care liability claims and gross negligence against the defendants and pleaded that T-Med is vicariously liable for Fernandez's acts and omissions. She timely served expert reports by Dr. Nicholas Theodore, a board-certified

2

neurosurgeon; Dr. Stan Skinner, a physician and IONM practitioner; and Maureen Stokes, an electrophysiologist who trains and supervises clinicians in IONM.

Fernandez and T-Med objected to the sufficiency of the expert reports and moved to dismiss Gonzales's claims against them. (They did not challenge the experts' qualifications.) The trial court overruled the objections and denied the motion to dismiss. Fernandez and T-Med now bring this interlocutory appeal from that order.

### APPLICABLE LAW AND STANDARD OF REVIEW

A claimant bringing a health care liability claim must serve each defendant to her claim with an adequate expert report. *See* Tex. Civ. Prac. & Rem. Code § 74.351(a); *E.D. ex rel. B.O. v. Texas Health Care, P.L.L.C.*, 644 S.W.3d 660, 662, 664 (Tex. 2022) (per curiam). "A report is adequate if it represents 'an objective good faith effort' to provide 'a fair summary of the expert's opinion' regarding the applicable standard of care, the [defendant]'s breach of that standard, and the causal relationship between the breach and the harm alleged." *E.D. ex rel. B.O.*, 644 S.W.3d at 662 (quoting Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6)). "One expert need not address the standard of care, breach, and causation; multiple expert reports may be read together to determine whether these requirements have been met." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam) (citing Tex. Civ. Prac. & Rem. Code § 74.351(i)); *see also Fitzpatrick v. Reale*, No. 03-17-00465-CV, 2018 WL 1321535, at *4 (Tex. App.—Austin Mar. 15, 2018, no pet.) (mem. op.) (expert-report requirement may be satisfied by using more than one report).

When there are multiple defendants, the expert report or reports generally "must set forth the standard of care for each defendant and explain the causal relationship between each

3

defendant's individual acts and the injury." *Seton Fam. of Hosps. v. White*, 593 S.W.3d 787, 792 (Tex. App.—Austin 2019, pet. denied). But when a claimant has pleaded that a defendant is vicariously liable for a health care liability claim, a report suffices to implicate that defendant so long as it adequately implicates the actions of its agent or employee. *See Baty v. Futrell*, 543 S.W.3d 689, 694 n.5 (Tex. 2018); *Gardner v. United States Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) (per curiam).

"An expert report demonstrates a 'good faith effort,' and is sufficient under the statute, when it '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *E.D. ex rel. B.O.*, 644 S.W.3d at 664 (quoting *Baty*, 543 S.W.3d at 693–94). A report is not a good-faith effort if it omits any of the statutory requirements. *See HMIH Cedar Crest, LLC v. Buentello*, No. 03-20-00377-CV, 2022 WL 627226, at *2 (Tex. App.—Austin Mar. 4, 2022, no pet.) (mem. op.). At the preliminary, expert-report stage, "whether the expert's explanations are 'believable' is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort." *E.D. ex rel. B.O.*, 644 S.W.3d at 664 (quoting *Abshire*, 563 S.W.3d at 226).

To sufficiently articulate the standard of care, breach, or causation, conclusory statements fall short of what the statute requires. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017); *HMIH Cedar Crest*, 2022 WL 627226, at *2. An expert's opinion is conclusory when either (1) the expert asks the factfinder to take the expert's word that an opinion is correct but offers no basis for the opinion or (2) the expert offers only the expert's word that the bases offered to support an opinion exist or support the opinion. *HMIH Cedar Crest*, 2022 WL 627226, at *2 (citing *Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex.

4

2019)); *see also Zamarripa*, 526 S.W.3d at 461 ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which we have held are clearly insufficient.").

If after the time has passed for the claimant to serve her adequate expert report her purported report or reports are not adequate, the defendants may move to dismiss the claims against them and seek their reasonable attorneys' fees and costs. *See* Tex. Civ. Prac. & Rem. Code § 74.351(b); *E.D. ex rel. B.O.*, 644 S.W.3d at 664. A trial court's denial of a challenge to the adequacy of expert reports is reviewed for an abuse of discretion. *See E.D. ex rel. B.O.*, 644 S.W.3d at 662, 664; *Abshire*, 563 S.W.3d at 223. The adequacy inquiry is confined to the four corners of the report or reports, taken as a whole. *See E.D. ex rel. B.O.*, 644 S.W.3d at 664. Because of the abuse-of-discretion standard, "[c]lose calls must go to the trial court." *Id.* (internal quotation omitted). Also under that standard, we defer to the trial court's fact findings if they are supported by evidence but review its legal conclusions de novo. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam).

## DISCUSSION

In their first issue, Fernandez and T-Med maintain that the reports by Dr. Theodore, Dr. Skinner, and Stokes "failed to provide a sufficient opinion on the applicable standard of care as to Appellants and breach of that standard of care." Their third issue is similar but focuses only on the claims that T-Med is directly liable, instead of merely vicariously liable because of others' acts or omissions: the "expert reports failed to provide a sufficient opinion on the applicable standard of care as to T-Med . . . and breach of that standard."

"In articulating the standard of care and breach, an expert report 'must set forth specific information about what the defendant should have done differently'; that is, 'what care

5

was expected, but not given.'" *E.D. ex rel. B.O.*, 644 S.W.3d at 664 (quoting *Abshire*, 563 S.W.3d at 226). Thus, an expert's opinion that a hospital "did not take proper precautions to prevent a patient from falling did not sufficiently address the standard of care because it failed to apprise the parties of the specific conduct complained of—be it a failure to monitor more closely, restrain more securely, or something else altogether." *Abshire*, 563 S.W.3d at 226–27 (citing *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)). Merely referring to general concepts of assessment, monitoring, or interventions is insufficient. *HMIH Cedar Crest*, 2022 WL 627226, at *2. On the other hand, whether the standards of care that the reports articulate "appear reasonable is not relevant to the analysis." *See Zachariah v. Durtschi*, No. 03-20-00394-CV, 2022 WL 1509303, at *7 (Tex. App.—Austin May 13, 2022, no pet.) (mem. op.) (internal quotation omitted) (quoting *Abshire*, 563 S.W.3d at 226).

Stokes in her report explained the role of IONM during Gonzales's surgery. IONM is used "to identify signs of new or evolving functional neurologic compromise during the surgery which can potentially be reversed." She then explained that multiple methods, or "modalities," of IONM often should be used during a single surgery:

> In general, these modalities can, and should, be used concurrently, depending on the particular surgical procedure. The potential of false negatives and possibility of incomplete assessment of the nervous system at risk are both greatly reduced by monitoring two or more modalities concurrently. Multimodal neuromonitoring relies on the strengths of the different types of neurophysiological modalities to maximize the diagnostic efficacy, sensitivity and specificity in the detection of impending neural injury.

For surgeries potentially affecting the spinal cord, like Gonzales's, "the integrity of the spinal cord is the chief consideration for modality selection," for which the IONM "team is to select the most meaningful and relevant of available . . . modalities for the given procedure."

6

Stokes explained particular IONM modalities and suggested that during Gonzales's surgery some were used and others were not or were misused. The modality of somatosensory evoked potential (SSEP) "provides assessment of spinal cord integrity through the summated neural signals that enter the spinal cord through the dorsal column-medial lemniscus pathway." She contrasted SSEP with electromyography (EMG), "which is most sensitive for disturbances of nerve root function and is primarily concerned with the monitoring of spontaneous motor activity in designated muscles of interest." EMG often should be paired with "train of four" monitoring (TOF), Stokes said. TOF "assess[es] neuromuscular transmission during surgery in the presence of neuromuscular blocking agents as part of the anesthetic regime." And it "indicates the level of paralysis at the time of testing and should be used at several points in time during the surgical procedure as an indicator of the usefulness of the EMG monitoring." Finally, Stokes explained that transcranial motor evoked potentials (tcMEP) is "a valuable monitoring tool during procedures such as the one [here], as tcMEPs are an assessment of the spinal cord motor tracts, more specifically of the anterior spinal cord and corticospinal tract." Stokes suggested that Fernandez used SSEP and EMG during Gonzales's surgery but not tcMEP and did not get reliable TOF data.

With all this as background, Stokes identified acts and omissions by Fernandez that Stokes opined fell below the applicable standard of care. She noted that there was SSEP monitoring for "only one upper extremity nerve" on Gonzales and opined that "[m]ore information on the status of the cervical cord would have been gained by also monitoring the median nerve of the upper extremity." She next said that the TOF monitor for the surgery flagged "an ALERT event" but that while TOF "was attempted throughout the procedure," Fernandez and others did not obtain reliable TOF data "for unknown reasons." Stokes faulted Fernandez for not correcting for this: "There is no indication that tech Fernandez informed the remote physician or surgeon of

7

unusable TOF data, attempted any technical troubleshooting or consulted with the anesthesiologist to obtain reliable TOF or neuromuscular blockade information." Stokes continued, "The lack of TOF information puts into . . . question the sensitivity and usefulness of the EMG monitoring throughout the surgical procedure." She next opined that Fernandez "billed out" too few electrodes during the monitoring: "The Technical Report indicates only 7 pairs of electrodes billed out, which does not appear to be an adequate number of electrodes to properly monitor for this surgical case."

Stokes identified still other features of the applicable standard of care and how Fernandez fell short of them. Stokes opined, "The standard of care requires a neuromonitoring technician to have a conversation, prior to a surgical procedure, with the surgeon and remote monitoring physician with regard to the type of monitoring to occur, in order to ensure that proper monitoring occurs for a specific surgical case." Fernandez fell short of this because she "documented no such conversation here, and there was no monitoring of the" tcMEPs. Plus, she "failed to meet the standard of care by failing to have a conversation with [the surgeon] and [the remote monitoring physician] to impart the significance of using [tc]MEPs for the planned cervical procedures," which "would have provided further data regarding neurologic changes, which would have then alerted the surgeon to the neurologic problems occurring during the surgery."

Next, Stokes noted that although SSEP was used during the surgery, Fernandez fell below the standard of care by misusing, misunderstanding, or not communicating the SSEP data. Stokes explained this in detail, after observing that close monitoring of changes in SSEP data can reveal compromises to neurological pathways:

> [I]t is critical for any such changes/abnormalities to be identified and reported immediately. The standard of care requires a[ ]neuromonitoring technician to mark with a cursor each waveform to indicate latency and amplitude

8

values, and alert the surgeon and remote monitoring physician of changes or degradation to the amplitude and latency of the waveform intraoperatively.

The standard of care requires that SSEPs must be acquired with an interval of no more than three minutes between trials throughout the procedure. Then, once a significant change is recognized (such as the greater than 50% decrease in amplitude here), relevant monitoring updates and surgeon awareness and acknowledgement must be made by the neuromonitoring technician approximately every 3 minutes. Ms. Fernandez only marked 3 of the total 14–15 sets of data, which is below the standard of care.

The standard of care requires surgeon notification when there is a 50% decrease in amplitude compared to baseline, as there was here. Ms. Fernandez failed to recognize that there were significant changes (decreased amplitude and increased latency), during and immediately after insertion of the cage, which is a violation of the standard of care. Ms. Fernandez further fell below the standard of care by failing to immediately notify both [the surgeon] and [the remote monitoring physician] of these changes intraoperatively. Failure to obtain reliable TOF data or other neuromuscular blockade assessment which puts into question the reliability and sensitivity of the spontaneous EMG monitoring is also below the standard of care.

Dr. Skinner in his report endorsed and adopted all of Stokes's statements. He specifically reiterated that the applicable standard of care required Fernandez "to have a conversation with [the surgeon] about the importance of having [tc]MEP monitoring in addition to the SSEP monitoring." He also noted that there is nothing in the relevant medical records to "show that th[e] significant abnormalities" in Gonzales's SSEP readings "were identified or discussed among" the surgeon, the remote monitoring physician, and Fernandez.

These reports, we conclude, amount to an objective good-faith effort to provide a fair summary of the opinions about the standard of care applicable to Fernandez and her alleged breaches. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *E.D. ex rel. B.O.*, 644 S.W.3d at 662. They set forth specific information about what Fernandez should have done differently— what care was expected of her but not given. *See E.D. ex rel. B.O.*, 644 S.W.3d at 664. They say that she should have (1) monitored at least a second nerve, the median nerve of Gonzales's arm,

9

while using SSEP monitoring; (2) in the face of the unusable TOF data either told the physicians about the problem, tried technical troubleshooting, or consulted with the anesthesiologist; (3) "billed out" more than 7 electrodes; (4) either talked with the physicians about the lack of any tcMEP monitoring as a component of appropriate monitoring for Gonzales's surgery or performed tcMEP monitoring; (5) marked more than 3 sets out of the total SSEP data; and (6) recognized the significant changes in the SSEP data and told the physicians about the changes during the surgery. *See id.* at 665–66 (holding that court of appeals erred by concluding that report fell short of fair-summary standard on breach when report identified defendant's breach as "failure to timely and accurately evaluate" data about fetal heart rate "either personally or by making appropriate inquiries of the attending nurse"); *Zachariah*, 2022 WL 1509303, at *8–9 (holding that trial court did not abuse its discretion by overruling standard-of-care and breach challenges to report that properly explained that defendant should have performed certain test and why test was needed to meet standard of care).

We disagree with Fernandez and T-Med's arguments that Stokes's opinions are conclusory or speculative. Stokes provided the bases for her opinions, including her years of training and practice with IONM and her review of the relevant medical records with specific reference to acts or omissions documented in them, and explanations for how the facts surrounding Gonzales's surgery supported the opinions. Stokes linked the background and purposes of IONM generally and of the different monitoring modalities with how they work together to support better outcomes for patients and explained why more modalities, and better use of the SSEP modality's data, were needed here. Stokes thus provided in her report more than just her say-so about her opinions and their support. *See Windrum*, 581 S.W.3d at 769; *HMIH Cedar Crest*, 2022 WL 627226, at *2; *see also E.D. ex rel. B.O.*, 644 S.W.3d at 666–67 ("[T]he court's job at

10

this stage is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory. . . . [T]he court's skepticism about the expert's opinion does not render it [conclusory]." (internal quotation omitted)).

Fernandez and T-Med specifically identify as conclusory Stokes's statement that no conversation involving Fernandez about the lack of tcMEP monitoring as a part of appropriate monitoring for Gonzales's surgery was documented. They argue that Stokes's statement elsewhere in her report that tcMEP was "declined" must mean that Fernandez did in fact discuss tcMEP with the physicians. But this argument does not capture all of Stokes's relevant opinions on the topic. In full context, Stokes opined that Fernandez needed not simply to discuss tcMEP in general with the physicians but particularly why tcMEP was appropriate for use with Gonzales:

> Transcranial Motor Evoked Potentials (tcMEP) *is also a valuable monitoring tool during procedures such as the one Ms. Gonzales underwent*, as tcMEPs are an assessment of the spinal cord motor tracts, more specifically of the anterior spinal cord and corticospinal tract.
>
> . . . .
>
> The standard of care requires a neuromonitoring technician to have a conversation, prior to a surgical procedure, with the surgeon and remote monitoring physician with regard to the type of monitoring to occur, in order to *ensure that proper monitoring occurs for a specific surgical case*. Ms. Fernandez documented no *such conversation* here, and there was no monitoring of the tcMEP[s]. . . . Ms. Fernandez failed to meet the standard of care by failing to have a conversation with [the surgeon] and [the remote monitoring physician] *to impart the significance of using* [*tc*]*MEPs* for the planned surgical procedures.

(Emphases added.) The full context shows that a conversation about only whether tcMEP would be used would fall below Stokes's articulation of the standard of care. Thus, the fact that tcMEP was declined does not undermine Stokes's opinions.

11

Finally for standard of care and breach, Fernandez and T-Med argue that Stokes's opinions faulting Fernandez for not using tcMEP inappropriately charge Fernandez with a decision that only a licensed physician could make. For this position they rely on *Zamarripa*, in which the Supreme Court of Texas noted that because nurses may not practice medicine, a hospital defendant "appear[ed] to be correct" that it could not be faulted for its nurses' having permitting a patient transfer because that was a decision only a licensed physician could make. *See* 526 S.W.3d at 461 & n.36. *Zamarripa* references the statutory definition of "practicing medicine"—"the diagnosis, treatment, or offer to treat a mental or physical disease or disorder . . . or injury." *Id.* at 461 n.36 (internal quotation omitted) (quoting Tex. Occ. Code § 151.002(a)(13)). But Fernandez and T-Med have not shown why the choice to use a certain modality of IONM to monitor a patient during a surgery constitutes the practice of medicine. *See, e.g.*, *Baker v. Chapa*, No. 13-18-00667-CV, 2020 WL 7251866, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 10, 2020, no pet.) (mem. op.) (expert reports did not require practice of medicine by non-physician: "[T]he expert reports identify specific actions that do not require diagnosis or treatment. While Baker is not authorized to order a cesarean section or to perform the operation, she is not prohibited from taking actions to ensure that the procedure can be accomplished in a timely manner." (internal citation omitted) (citing Tex. Occ. Code § 151.002(a)(13))); *Columbia Valley Healthcare Sys., L.P. v. Guerrero*, No. 13-18-00382-CV, 2020 WL 6789341, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 19, 2020, no pet.) (mem. op.) (expert report did not fault hospital or nurses for acts or omissions that would constitute practice of medicine because expert "did not propose a standard of care that required the nursing staff to diagnose or treat a mental or physical disease or disorder" (citing Tex. Occ. Code § 151.002(a)(13))); *cf. Methodist Hosp. v. German*, 369 S.W.3d 333, 342–43 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (report improperly faulted nurses for not

taking action that would have constituted practice of medicine: analyzing nature and cause of patient's condition from among patient's symptoms, as distinct from merely reporting those symptoms, is diagnosing).

In all, we hold that the trial court was within its discretion to decide that Stokes's and Dr. Skinner's reports provide sufficient information about the standard of care applicable to Fernandez and her alleged breaches and so represent a good-faith effort at a fair summary. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *E.D. ex rel. B.O.*, 644 S.W.3d at 662, 664. We thus overrule Fernandez and T-Med's first issue. And because the theory that T-Med is vicariously liable for Fernandez's acts and omissions is fully supported by the reports' statements about Fernandez, we need not reach Fernandez and T-Med's third issue, which concerns T-Med's direct liability. *See* Tex. R. App. P. 47.1; *Baty*, 543 S.W.3d at 694 n.5; *Gardner*, 274 S.W.3d at 671–72.

In their second issue, Fernandez and T-Med challenge causation: the "expert reports failed to adequately set forth a causal chain linking any alleged harm actually suffered to a specific breach of an applicable standard of care by Appellants." And as with their third issue, their fourth concerns causation only for T-Med's alleged direct liability: the "expert reports failed to adequately set forth a causal chain linking any alleged harm actually suffered to a specific breach of an applicable standard of care by" T-Med.

Causation here refers to whether a breach "was a substantial factor in bringing about the harm and without which the harm would not have occurred." *Zachariah*, 2022 WL 1509303, at *4 (internal quotation omitted). An expert report must "explain 'how and why' the alleged negligence caused the injury in question." *Id.* (internal quotation omitted) (quoting *Abshire*, 563 S.W.3d at 224). "In satisfying this 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort

13

to explain, factually, how proximate cause is going to be proven.'" *Id.* (internal quotation omitted) (quoting *Abshire*, 563 S.W.3d at 224). "An expert may show causation by explaining a chain of events that begins with a defendant health-care provider's negligence and ends in injury to the plaintiff." *HMIH Cedar Crest*, 2022 WL 627226, at *2. "[W]ith respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury"; "[w]hether this explanation is believable should be litigated at a later stage of the proceeding." *Zachariah*, 2022 WL 1509303, at *4 (internal quotations omitted) (quoting *Abshire*, 563 S.W.3d at 226). Only physicians may render causation opinions in the required expert report. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(C).

Dr. Skinner's report addressed causation by explaining two chains of events, stemming, respectively, from Fernandez's not using tcMEP during the surgery and from her not telling the physicians during the surgery about the significant changes shown in the SSEP data:

> If there is an injury, then there is a disruption or documented change in the [tc]MEP readings. Within a reasonable degree of certainty, the [tc]MEPs would have provided an even more extreme change in the patient's condition. Or, at least, [tc]MEPs would have provided redundant and corresponding results, permitting more certain recognition of a major spinal cord conduction block. Thereafter, the incipient damage done could have been reported to the surgeon for an immediate intervention, which is removal of the device or consider cessation of the effort to place the cage followed by recovery of normal IONM waveforms.
>
> . . . .
>
> A detectible abnormality occurred immediately after placement of the cage began. However, because [the remote monitoring physician] and Ms. Fernandez failed to detect and report the abnormality to the surgeon, [the surgeon] proceeded with the surgery, continuing to manipulate the cage in the same area. . . . [C]ontinued manipulation without immediate removal of the cage caused neurologic injury to the patient. Prior to surgery, she was able to use her right upper and lower extremities. Immediately following the surgery (wherein the SSEP data demonstrated neurologic injury after placement of the cage), Ms. Gonzales was unable to move her right upper and lower extremities.

14

Dr. Skinner's report thus identifies two chains of events beginning with points identified in Stokes's report as alleged breaches of the applicable standard of care—Fernandez's (1) neither talking with the physicians about the lack of tcMEP monitoring as a component of appropriate monitoring for Gonzales's surgery nor performing tcMEP monitoring and (2) not recognizing the significant changes in the SSEP data or telling the physicians about the changes during the surgery. Dr. Skinner's chains of events articulate causation. *See HMIH Cedar Crest*, 2022 WL 627226, at *2. This means that his report is to an objective good-faith effort to provide a fair summary of his opinions about causation. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *E.D. ex rel. B.O.*, 644 S.W.3d at 662.

Fernandez and T-Med base many of their arguments about the insufficiency of Dr. Skinner's report on this statement made in Dr. Theodore's report: "Once there is a contusion or damage to the spinal cord, it can cause serious injury and paralysis in specific portions of the body, based on the area of the spinal cord which has been contused." Fernandez and T-Med then refer to Dr. Skinner's statement that a "detectible abnormality" in the SSEP data "occurred immediately after placement of the cage began." From these statements, they argue that it must have only been the surgeon's initial placement of the cage which injured Gonzales and that nothing Fernandez allegedly did wrong could have altered the surgeon's injuring-causing act.

But this view misses some of the physicians' relevant opinions. Dr. Theodore allowed for the possibility that "any contusion or compression" of the spinal cord "can lead to extremity weakness and permanent paralysis." And Dr. Skinner opined that more than just the initial placement of the cage injured Gonzales: "the incipient damage done could have been reported to the surgeon *for an immediate intervention*, which is removal of the device or consider cessation of the effort to place the cage followed by recovery of normal IONM waveforms," and

"*continued manipulation* without immediate removal of the cage caused neurologic injury to the patient." (Emphases added.) The experts thus did not opine that the initial placement of the cage was the only act that injured Gonzales. Dr. Skinner explained a chain of events beginning either with the lack of tcMEP data or with the lack of recognizing and reporting the danger shown by the SSEP data, continuing with the failure to recognize injury upon initial cage placement and continuing the surgery despite the injury, and ending with Gonzales's injuries.[2]

We therefore hold that the trial court was within its discretion to decide that Dr. Skinner's report provides sufficient information about causation and so represents a good-faith effort at a fair summary. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *E.D. ex rel. B.O.*, 644 S.W.3d at 662, 664. His causation opinions were not conclusory or speculative: his report explained the medical records that he reviewed, his background and experience, and the facts that support how and why Fernandez's alleged breaches led to Gonzales's injuries. *See Windrum*, 581 S.W.3d at 769; *HMIH Cedar Crest*, 2022 WL 627226, at \*2; *see also E.D. ex rel. B.O.*, 644 S.W.3d at 666–67 ("[T]he court's job at this stage is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory. . . . [T]he court's skepticism about the expert's opinion does not render it

---

[2] Fernandez and T-Med analogize this case to *Intra-Op Monitoring Services, LLC v. Causey*, No. 09-12-00050-CV, 2012 WL 2849281 (Tex. App.—Beaumont July 12, 2012, no pet.) (mem. op.), but the analogy does not hold because the *Causey* expert report's "entire explanation concerning" causation was simply: "Based on the review of the medical records made available to me, it is my opinion that the Plaintiff's injuries/damages were proximately caused in whole or in part by the failure of [defendants] to follow the applicable standard of care." *Id.* at \*2. Dr. Skinner's report goes beyond the *Causey* expert's. While the *Causey* expert did not reveal what information the defendants should have told the surgeon before she cut the plaintiff's facial nerve, *see id.*, Dr. Skinner's report ties alleged breaches identified by Stokes to Gonzales's injuries. For example, Dr. Skinner opined that if Fernandez had communicated the change in SSEP data to the surgeon, "continued manipulation" near Gonzales's spinal cord would have stopped, thereby preventing her injuries.

[conclusory]." (internal quotation omitted)). An expert report adequate on even just "one theory only . . . entitles the claimant to proceed" with her suit. *Zachariah*, 2022 WL 1509303, at *3 (internal quotation omitted) (quoting *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013)). We thus overrule Fernandez and T-Med's second issue. As with their third issue, we need not reach their fourth, which concerns causation relating only to T-Med's direct liability. *See* Tex. R. App. P. 47.1; *Baty*, 543 S.W.3d at 694 n.5; *Gardner*, 274 S.W.3d at 671–72.

## SANCTIONS

In a cross-point, Gonzales asks that we award her damages as sanctions for Fernandez and T-Med's having filed a frivolous appeal. *See* Tex. R. App. P. 45. We overrule the cross-point. *See Jones v. Heslin*, No. 03-20-00008-CV, 2020 WL 4742834, at *6 (Tex. App.—Austin Aug. 14, 2020, pet. denied) (mem. op.) (concluding that sanctions were inappropriate in part because court's sanctions authority "is a matter of discretion" to be "exercise[d] with prudence and caution and only after careful deliberation" and in part because "sanctions are unwarranted when party had a reasonable expectation of reversal" (internal quotations omitted) (quoting *Caldwell v. Zimmerman*, No. 03-17-00273-CV, 2017 WL 4899447, at *3 (Tex. App.—Austin Oct. 26, 2017, pet. denied) (mem. op.), and citing *Easter v. Providence Lloyds Ins. Co.*, 17 S.W.3d 788, 792 (Tex. App.—Austin 2000, pet. denied))).

**CONCLUSION**

We affirm the trial court's order.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:   August 26, 2022