# Supreme Court of Texas

No. 23-0010

Daniel Walker and Kristen Walker,

*Petitioners*,

v.

Baptist St. Anthony's Hospital and Rhodesia Castillo, M.D.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

**PER CURIAM**

Justice Bland filed a concurring opinion, in which Justice Boyd joined.

This case involves preliminary expert reports filed by the Walkers in their medical negligence suit against defendants Baptist St. Anthony's Hospital and Dr. Rhodesia Castillo. The Walkers' reports attempt to show that several acts and omissions by Dr. Castillo and the Hospital nurses in delivering the Walkers' son, Henry,[1] caused him

---

[1] To protect the child's identity, we refer to him by a pseudonym.

permanent neurologic injury. Defendants filed objections to the Walkers' reports and a motion to dismiss, challenging the experts' qualifications and arguing that the reports insufficiently explained the applicable standards of care, how they were breached, and the causal link between the alleged breaches and Henry's resulting injuries.

The trial court overruled Defendants' objections and denied their motion, ruling that the reports provided a fair summary of the experts' opinions regarding the standard of care, breach, and causation, as required by the Texas Medical Liability Act. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (l), (r)(6). The court of appeals reversed, holding the reports contained conclusory and incomplete language that did not sufficiently explain the cause of Henry's brain injury. We conclude that the reports sufficiently explain causation and that the trial court correctly rejected Defendants' other challenges. We therefore reverse the court of appeals' judgment and remand this case to the trial court for further proceedings.

**I**

Kristen Walker gave birth to her son Henry while under Dr. Castillo's care at the Hospital. After delivery, Henry required resuscitation because he asphyxiated during Kristen's labor and allegedly suffered a stroke—specifically, a large subacute infarction involving the majority of his left cerebral hemisphere and other smaller infarctions in his right cerebral hemisphere.

The Walkers, individually and on Henry's behalf, sued the Hospital and Dr. Castillo for negligence occurring before and during Henry's birth. They contend the Hospital and Dr. Castillo caused

2

Henry's neurologic injury, and they supplied three expert reports from obstetrician Dr. Tappan, neonatologist Dr. Null, and Nurse Beach. The Hospital and Dr. Castillo objected to the experts' qualifications and filed a motion to dismiss challenging the reports' sufficiency under Section 74.351 of the Civil Practice and Remedies Code. The parties then agreed the Walkers could amend the reports so long as they waived their right to seek a future thirty-day extension to serve another report. The Walkers filed amended reports for all three experts. Because we conclude that the reports from Drs. Tappan and Null are sufficient, we need not address the sufficiency of Nurse Beach's report or Defendants' other challenges to that report.

The doctors' amended reports criticize the Hospital nurses and Dr. Castillo for failing to measure Henry's heart rate with a fetal scalp electrode. They also fault Dr. Castillo for leaving the hospital for over an hour despite knowing Henry's heart rate was decelerating, administering more Pitocin to Kristen despite Henry exhibiting non-reassuring fetal heart rate patterns, delaying in ordering and performing a cesarean section, and pushing on Henry's head rather than pulling on his feet—also known as reverse breech extraction—when he was stuck in Kristen's pelvis during the cesarean section. And they fault the nurses for failing to contact superiors when Dr. Castillo left the hospital and failing to discontinue or administer particular medications in response to certain fetal heart patterns.

The reports also discuss how Dr. Castillo's and the Hospital nurses' negligence caused Henry's resulting neurologic injury. In particular, Dr. Tappan opined that "[a]s a result" of the Hospital nurses'

3

deviations from the standard of care, "baby [Henry] was subject to more than an additional hour of intrauterine hypoxia," and that "[t]he failure to meet the standards of care . . . was a substantial factor in causing injuries suffered by [Henry] Walker." As to Dr. Castillo, Dr. Tappan opined that "[h]ad Dr. Castillo decided for cesarean at or about 15:15 and had she atraumatically delivered Baby [Henry] by 15:45 . . . [Henry] Walker would have been born without neurologic injury." He also opined that "[b]ut for Dr. Castillo's failure to deliver by reverse breech extraction, [Henry] Walker would not likely have suffered these complications and injuries," and that "[i]t was foreseeable to an ordinarily prudent obstetrician that failure to deliver by reverse breech extraction might reasonably result in traumatic extraction, physical craniocerebral deformation, and trauma." At another point, Dr. Tappan's report stated Henry's MRI scan "suggests the possibility that [Henry] sustained a perinatal arterial ischemic stroke."

Dr. Null's report drew similar conclusions. He opined that Henry's "course postdelivery is consistent with an antenatal asphyxia event . . . [and] [m]ore likely than not had [Henry] been delivered one to one and a half hours sooner he would not have suffered the degree of brain injury that he has."

The Hospital and Dr. Castillo reasserted their challenges to the amended reports. Among other things, they argued that Dr. Tappan's report was speculative and conclusory, stating merely that Henry's MRI scan "suggests the possibility" of stroke. And as to Dr. Null, they argued that his report never explains the basis for his opinions and instead leaves the reader to draw inferences.

4

The trial court overruled the Hospital's and Dr. Castillo's objections and denied their motion to dismiss. The court of appeals reversed, holding that although there is "[n]o doubt[] something happened leaving child and parent to suffer the consequences," the doctors' reports provide "less than a fair summary allowing jurists to reasonably conclude that either [the Hospital] or Castillo caused the harm suffered by [Henry]." ___ S.W.3d ___, 2022 WL 17324338, at *5 (Tex. App.—Amarillo Nov. 29, 2022). In that court's view, "though it may be foreseeable that pushing on a baby's head during extraction may cause injury, how and why it did in this particular instance was left unaddressed . . . . So too do the reports leave one to legitimately ask how the asphyxia or infarction was reasonably foreseeable from the alleged defaults other than pushing on [Henry's] head." *Id.* "Whether asphyxia . . . can lead to such brain injury was left to inference or speculation." *Id.* at *4.

## II

The Texas Medical Liability Act requires healthcare liability claimants to serve a defendant healthcare provider with a timely and adequate expert report. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (l). An expert report is adequate if it "represent[s] an objective good faith effort" to provide a "fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(l), (r)(6). A report demonstrates a good-faith effort when it "(1) inform[s] the defendant of the specific conduct

5

called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693-94 (Tex. 2018)). The purpose of these requirements "is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id.*

"We review a trial court's decision to grant or deny a motion to dismiss based on the adequacy of an expert report for an abuse of discretion." *Id.* Accordingly, "close calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006). A trial court abuses its discretion "if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). In addressing whether an expert report meets the Texas Medical Liability Act's requirements, "it [i]s incumbent on the trial court . . . to review the report, sort out its contents, resolve any inconsistencies in it, and decide whether the report demonstrate[s] a good faith effort to show that the [plaintiff's] claims ha[ve] merit." *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015). In cases like this one, where more than one expert report is filed, "we review the adequacy of reports in the aggregate." *Uriegas v. Kenmar Residential HCS Servs., Inc.*, 675 S.W.3d 787, 790 (Tex. 2023).

To meet the standard of good-faith effort as to causation, a report need not use magic words like "proximately caused," but it must "explain, to a reasonable degree, how and why the breach caused the injury." *Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010). Because

6

bare conclusions are not enough, a report must "explain, factually, how proximate cause is going to be proven," although it "need not prove the entire case or account for every known fact." *Abshire*, 563 S.W.3d at 224 (internal quotation marks omitted).

The court of appeals focused its analysis on Defendants' challenge that the reports do not adequately explain proximate cause. Defendants reassert additional challenges in their merits briefs that the court of appeals did not reach, arguing that the reports also do not adequately address either the standard of care or breach. Applying the standards just discussed to these challenges, we conclude that the amended reports of Drs. Tappan and Null together explain that breaches of the standard of care by Dr. Castillo and the nurses caused Henry's injury.

Dr. Tappan stated in his report that the standard of care during a C-section requires "expeditious and atraumatic delivery of the baby." He explained the difference between pulling on the baby's feet during delivery (which he opined Dr. Castillo should have done) and pushing the baby out (which Dr. Castillo did). The pull method is "quicker to perform and is associated with a 50% decreased risk for NICU admissions," while the push method is "associated with serious fetal morbidity including a fractured skull." In his report, Dr. Tappan concludes that by pushing on Henry during delivery, Dr. Castillo "fell below the standard of care by failing to deliver baby [Henry] in an atraumatic fashion."

Dr. Tappan's explanation of proximate cause regarding this breach is clear:

> Dr. Castillo's failure to deliver [by the pull method] proximately caused traumatic extraction, physical

7

craniocerebral deformation, and traumatic injury to the brain. But for Dr. Castillo's failure to deliver by [the pull method], [Henry] would not likely have suffered these complications and injuries. It was foreseeable to an ordinarily prudent obstetrician that failure to deliver by [the pull method] might reasonably result in traumatic extraction, physical craniocerebral deformation, and trauma, including the increased risk of arterial ischemic stroke with injury to the fetal brain.

This explanation, especially coupled with the statistics above regarding consequences of the push method, sufficiently signals the merit of plaintiffs' claims. *See Abshire*, 563 S.W.3d at 223 (expert reports serve "to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims").

Additional breaches the experts identified were Dr. Castillo's delay in ordering and performing the C-section and the Hospital nurses' failure to monitor and report critical data.[2] Dr. Tappan's report stated "non-reassuring fetal tracing is the second most common indication and requires assessment and prompt treatment to avoid fetal hypoxia and acidosis." By failing to use a fetal scalp electrode (which the nurses were authorized to apply by hospital protocol) or to observe, report, and act upon Henry's recurrent heart rate decelerations and the foreseeable "fetal hypoxia and acidosis" that could result, the Hospital nurses and Dr. Castillo allowed over an hour to pass before starting the C-section. During that time, Henry's heart rate baseline was "tachycardic (165 bpm), the variability was minimal, [and] accelerations were absent,

---

[2] We disagree with the concurrence's statement that this opinion does not address whether the reports adequately explain the applicable standard of care and breach with respect to the nurses.

8

. . . all signs consistent of ongoing fetal hypoxia." Dr. Tappan concluded that "[h]ad Dr. Castillo decided for cesarean delivery [sooner,] . . . [Henry] would have been born without" his injury. Dr. Tappan also concluded that during the hour before the C-section, the Hospital nurses and Dr. Castillo should have administered terbutaline, a drug commonly given in this situation that "would have arrested contractions and helped to restore oxygenated blood to the baby."

Dr. Null's report further supports Dr. Tappan's causation conclusions as to these breaches. He explained that Henry's infarction—"swelling over the left parietal and occipital areas [of the brain] with a 7 cm circular dark bruising over the swelling with central skin breakdown"—is "consistent with [a pre-birth] asphyxia event." Dr. Null concluded "more likely than not had [Henry] been delivered . . . sooner he would not have suffered the degree of brain injury that he has." Together, Drs. Tappan and Null's reports sufficiently explain the causal relationship between delaying a necessary C-section operation, failing to administer terbutaline, and fetal hypoxia.

Later in his report, Dr. Tappan stated that Henry's resulting injury "suggests the possibility that [Henry] sustained a perinatal arterial ischemic stroke." The Hospital and Dr. Castillo argue that the phrase "suggests the possibility" is "generic" and insufficiently explains how or why their misconduct caused Henry's resulting injury. Although "suggests the possibility" by itself would not be enough to explain causation, it does not cancel out Drs. Tappan and Null's conclusions that do. *Uriegas*, 675 S.W.3d at 790 ("[W]e review the adequacy of reports in the aggregate."); *see also Van Ness*, 461 S.W.3d at 144 ("[T]he appeals

9

court did not fully credit all of Dr. Jaffee's factual statements and opinions.").

The court of appeals concluded that the reports did not causally link Henry's asphyxia or hypoxia with his permanent resulting injury. But regardless of the precise physical connection between fetal hypoxia and a large subacute infarction, the reports sufficiently state that Henry's long-term neurologic deficits at birth would have been averted had the Defendants performed proper fetal heart rate monitoring, an atraumatic delivery, an earlier C-section, and proper drug administration. *Abshire*, 563 S.W.3d at 224 (reports must "explain, factually, how proximate cause is going to be proven," but "need not prove the entire case or account for every known fact"). Because an expert report need only address one theory of liability to meet the Texas Medical Liability Act's requirements, we do not discuss any other theories mentioned in the experts' reports. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

As an alternative basis for affirmance, Defendants also renew their challenges to the qualifications of Dr. Tappan—an obstetrician-gynecologist with experience managing fetal heart rate problems, head impaction, and associated risks of brain injury due to hypoxia—to opine about the cause of Henry's neurological injuries, and the qualifications of Dr. Null—a neonatologist with extensive experience managing patients with birth asphyxia—to opine regarding the standard of care for nurses and the causes of such asphyxia. The court of appeals did not reach this issue. Having reviewed the record in the interest of judicial economy and considered this issue on the merits, we conclude the trial

10

court did not abuse its discretion in overruling Defendants' objections to the experts' qualifications. Further discussion of this issue would not add to the jurisprudence of the State.

The concurrence takes the view that we have not provided a sufficient explanation supporting our resolution of this issue. But nothing in the appellate rules holds this Court to a particular explanatory standard when we are carrying out our discretionary review function.[3] As stewards of scarce judicial resources, we have previously declined to provide reasons regarding our disposition of certain issues when we conclude that no error requires reversal and further discussion is not important to the jurisprudence of the State. *See, e.g.*, *Virlar v. Puente*, 664 S.W.3d 53, 66 (Tex. 2023); *Columbia Valley Healthcare Sys., L.P. v. A.M.A. ex rel. Ramirez*, 654 S.W.3d 135, 141 n.3 (Tex. 2022); *Regent Care of San Antonio, L.P. v. Detrick*, 610 S.W.3d 830, 839 & n.9 (Tex. 2020); *cf.* TEX. R. APP. P. 56.1(b)(1).[4]

---

[3] *See* TEX. R. APP. P. 53.1, 56.1(a), 63. In contrast, the rules require courts of appeals to provide reasons on every necessary issue. *See id.* 47.1, 47.4 (specifying that court of appeals opinions must "address[] every issue raised and necessary to final disposition of the appeal" and "advise the parties of the basic reasons for [the court's decision]"). Even under those rules, however, a majority of this Court recently held that courts of appeals declining to exercise discretionary review over permissive appeals may comply by—at most— stating their conclusion that the governing legal standard was not met. *See Indus. Specialists, LLC v. Blanchard Ref. Co.*, 652 S.W.3d 11, 19 (Tex. 2022) (plurality opinion of Boyd, J.); *id.* at 23 (Blacklock, J., concurring) (concluding discretionary decision need not be explained).

[4] Similarly, we have summarily reversed or vacated judgments upon concluding that the case is controlled by a recent decision of this Court without explaining that decision's application. *E.g.*, *Hannah v. Thompson*, 694 S.W.3d 772 (Tex. 2024); *Mitchell v. Methodist Hosp.*, 335 S.W.3d 610 (Tex. 2011); *Escalante v. Rowan*, 332 S.W.3d 365, 366 (Tex. 2011); *City of Palestine v. Davis*,

The concurrence suggests that a fulsome explanation should nevertheless be provided in this case because the court of appeals did not address the qualification challenges. In this situation, "[w]e have the alternatives of (1) examining the points not considered by the court of appeals in order to determine whether any will support affirmance of that court's judgment, or (2) remanding the cause to the court of appeals for it to pass on those points." *Roark v. Allen*, 633 S.W.2d 804, 811 (Tex. 1982); *see* TEX. R. APP. P. 53.4. We agree with our concurring colleagues that the first option best serves judicial and litigant economy here. Thus, we have examined the qualification challenges not considered by the court of appeals and determined that they will not support affirmance. That is all our rules and precedent require.

## III

We hold the trial court did not abuse its discretion in overruling the Hospital's and Dr. Castillo's objections and denying their motion to dismiss under the Texas Medical Liability Act. The reports of Drs. Tappan and Null provide a fair summary of their opinions as to the causal relationship between Dr. Castillo's and the Hospital nurses' deviations from the standard of care and Henry's resulting neurologic

977 S.W.2d 328 (Tex. 1998); *Eckles v. City of Lubbock*, 846 S.W.2d 825 (Tex. 1992); *Bacon v. Gen. Devices, Inc.*, 830 S.W.2d 106 (Tex. 1992). And even without granting relief, we have directed trial courts to reconsider rulings in light of new authority without discussing the applicability of that authority. *E.g.*, *In re Parks*, 631 S.W.3d 700 (Tex. 2021); *In re Liberty County Mut. Ins. Co.*, 624 S.W.3d 796 (Tex. 2021); *Gulf Chem. & Metallurgical Corp. v. Miner Dederick Constr., LLP*, 455 S.W.3d 164 (Tex. 2015); *D.Y. v. Floyd*, 893 S.W.2d 536 (Tex. 1995); *Clements v. Spears*, 851 S.W.2d 192 (Tex. 1993); *Brown-Forman Corp. v. Westergren*, 819 S.W.2d 800 (Tex. 1991).

injury.  Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings.  *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** December 13, 2024